## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lincoln Lamar Caldwell,                              Case No. 17-cv-1971 (SRN/TNL)

        Petitioner,

v.                                                   **REPORT &**
                                                     **RECOMMENDATION**
Eddie Miles,
Warden Stillwater Correctional Facility,
Minnesota,

        Respondent.

Zachary A. Longsdorf, Longsdorf Law Firm, PLC, 5854 Blackshire Path, Suite 3, Inver Grove Heights, MN 55076 (for Petitioner); and

Linda K. Jenny, Assistant County Attorney, Hennepin County Attorney's Office, 300 South Sixth Street, Suite C-2000, Minneapolis, MN 55487 (for Respondent).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Petitioner Lincoln Lamar Caldwell's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 ("Petition") (ECF No. 1). Caldwell is represented by attorney Zachary A. Longsdorf. Respondent Eddie Miles is represented by Assistant Hennepin County Attorney Linda K. Jenny. This action has been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this

Court recommends that the habeas petition be **DENIED** and this action be **DISMISSED WITH PREJUDICE**.

## II. BACKGROUND

In light of the fact-intensive nature of the particular claims before the Court, the Court will provide an abbreviated summary of the underlying criminal, postconviction, and appellate proceedings at the outset. Additional detail will be provided below in conjunction with the Court's analysis.

### A. Underlying Criminal Proceedings

In June 2006, Brian Cole was killed in a drive-by shooting. *State v. Caldwell*, 803 N.W.2d 373, 377-78 (Minn. 2011) [hereinafter *Caldwell I*]; *Caldwell v. State*, 886 N.W.2d 491, 494 (Minn. 2016) [hereinafter *Caldwell III*]. "After conducting an investigation, police officers determined that Cole was standing near members of the One-Nine gang when he was shot." *Caldwell III*, 886 N.W.2d at 494; *accord Caldwell v. State*, 853 N.W.2d 766, 768 (Minn. 2014) [hereinafter *Caldwell II*]. "Although Cole was not a member of a gang, the One-Nine gang was engaged in an ongoing rivalry with the LL gang at the time." *Caldwell III*, 886 N.W.2d at 494; *accord Caldwell II*, 853 N.W.2d at 768. Caldwell and Kirk Harrison ("Kirk")[1] were both prosecuted for Cole's death. *See Caldwell I*, 803 N.W.2d at 379, 381.

---

[1] Kirk's brother, Carnell Harrison, was with Kirk and Caldwell on the day of the shooting and testified at Caldwell's trial. *Caldwell I*, 803 N.W.2d at 379, 380. To avoid confusion, the Court will refer to each of the Harrison brothers by their first names.

### 1. Kirk

Kirk was the shooter. *Caldwell II*, 853 N.W.2d at 768; *Caldwell I*, 803 N.W.2d at 382. Kirk was prosecuted for Cole's death separately from Caldwell. *Caldwell I*, 803 N.W.2d at 381. Kirk waived a jury and, at a bench trial,[2] was "convicted . . . of unintentional murder in the second degree for causing death while committing the felony crime of drive-by murder." *Id.* (Resp't's App. at 75.) As relevant to the instant Petition, the state district court judge determined, however, that "the State had failed to prove that Kirk . . . had the intent to cause the death of another, or that the 'LL's' met the statutory definition of a gang." *Caldwell I*, 803 N.W.2d at 381.

### 2. Caldwell

During the investigation of Cole's death, police received information that Caldwell was driving the SUV from which the shots were fired. *Id.* at 378. Caldwell was subsequently indicted on six counts of aiding and abetting murder under Minn. Stat. § 609.05: (1) first-degree premeditated murder in violation of Minn. Stat. § 609.185(a)(1); (2) first-degree premeditated murder for the benefit of a gang in violation of Minn. Stat. §§ 609.185(a)(1) and 609.229; (3) first-degree drive-by murder in violation of Minn. Stat. § 609.185(a)(3); (4) first-degree drive-by murder for the benefit of a gang in violation of Minn. Stat. §§ 609.185(a)(3) and 609.229; (5) second-degree drive-by murder in violation of Minn. Stat. § 609.19, subd. 1; and (6) second-degree

---

[2] Kirk's bench trial was before the Honorable Jack S. Nordby, District Court Judge for the Fourth Judicial District of Minnesota. (Resp't's App. at 22.)

3

drive-by murder for the benefit of a gang in violation of Minn. Stat. §§ 609.19, subd. 1(2) and 609.229, subds. 2, 3. *Caldwell I*, 803 N.W.2d at 379.

At trial,[3] evidence was presented to the jury regarding the LL gang, including hand signs, drug activities, and the rivalry with the One-Nine gang. *Id.* at 379-81. A witness confirmed that a photograph recovered from Caldwell's home showed Caldwell displaying "the 'LL' gang sign with one hand." *Id.* at 380. In brief, the shooting occurred when, while driving around, members of the LL gang spotted members of the One-Nine gang, and Kirk shot at the One-Nine gang in retaliation. *Id*. at 380-81.

A number of witnesses testified regarding the events on the day of the shooting. *Id.* at 379-81. The witnesses included individuals who were with Cole on the day of the shooting and saw Caldwell driving the SUV from which the shots were fired. *Id.* at 378, 379. The witnesses also included a number of individuals who were with Caldwell at the time of the shooting and other individuals who, while not present at the time of the shooting, heard Caldwell talk about the shooting. *Id.* at 379-81. Shawntis Turnage was one of the witnesses in the latter group. *Caldwell III*, 886 N.W.2d at 494; *see Caldwell II*, 853 N.W.2d at 768, 769; *Caldwell I*, 803 N.W.2d at 381.

Caldwell was found guilty on all six counts. *Caldwell I*, 803 N.W.2d at 381. Caldwell was ultimately "convicted . . . of first degree murder for the benefit of a gang and sentenced . . . to life in prison without the possibility of release." *Id.*

---

[3] The Honorable Peter A. Cahill, District Court Judge for the Fourth Judicial District of Minnesota, presided over Caldwell's jury trial. (Resp't's App. at 907.)

### B. Postconviction & Appellate Proceedings

#### 1. Consolidated Appeal: Direct Appeal & First Two Petitions for Postconviction Relief

Caldwell appealed his conviction to the Minnesota Supreme Court and the appeal was stayed pending postconviction proceedings. *Id.* at 381-82; *accord Caldwell III*, 886 N.W.2d at 494; *Caldwell II*, 853 N.W.2d at 769. Caldwell's direct appeal and appeals from the denials of postconviction relief were consolidated together in *Caldwell I*. 803 N.W.2d at 382. As relevant to the instant Petition, Caldwell argued that (1) he received ineffective assistance of trial counsel; (2) there was insufficient evidence that the LLs met the statutory definition of a gang; (3) there was insufficient evidence that Kirk acted with the premeditation and intent necessary to commit first-degree murder and therefore insufficient evidence to support Caldwell's conviction for aiding and abetting first-degree murder; (4) Minn. Stat. § 609.05, subd. 4, barred Caldwell's conviction for aiding and abetting first-degree murder because Kirk was acquitted of first-degree murder; and (5) Caldwell was denied his constitutional right to a public trial. *Id.* at 382-88, 390. The Minnesota Supreme Court affirmed Caldwell's conviction and the denials of his petitions for postconviction relief. *Id.* at 377, 391; *accord Caldwell III*, 886 N.W.2d at 494; *Caldwell II*, 853 N.W.2d at 769.

#### 2. Third Petition for Postconviction Relief

Caldwell later filed a third petition for postconviction relief, alleging that Turnage and two other individuals testified falsely at trial. *Caldwell III*, 886 N.W.2d at 494-95; *Caldwell II*, 853 N.W.2d at 769. The state postconviction court held an evidentiary

hearing.[4]  *Caldwell III*, 886 at 495.  "The [state] postconviction court . . . determined that it would not admit any witness's recorded statement unless the witness testified."  *Id.*

After Turnage took the stand and was sworn in, the state postconviction court advised Turnage of his right not to incriminate himself and generally instructed him on perjury.  *Id.*  Turnage confirmed that he understood his rights.  *Id.*  When asked by the state postconviction court if he needed time to consult with an attorney, Turnage asked if such consultation would prolong the proceedings.  *Id.*  When the state postconviction court responded that it would, "Turnage then said he did not want to talk to an attorney."  *Id.*

On direct examination, Turnage recanted his prior trial testimony.  *Id.*  During the State's cross examination,

> Turnage expressed confusion about his right to refrain from answering questions that might incriminate him.  The [state] postconviction court at one point told Turnage that he had to answer a question unless he thought it would incriminate him in some way.  Turnage responded that he was already incriminated and that he did not know what was going on.

*Id.* at 496.  After additional questioning by the State, the state postconviction court again reminded Turnage that he needed to answer the questions unless they would incriminate him and of his right not to incriminate himself.  *Id.*

> The State continued its cross-examination and at one point asked Turnage if he acknowledged that he was perjuring himself now on the stand or did so at the trial in 2008.

---

[4] Initially, the state postconviction court summarily denied the petition without an evidentiary hearing.  *Caldwell II*, 853 N.W.2d at 768, 769-70; *accord Caldwell III*, 886 N.W.2d at 493, 495.  On appeal, in *Caldwell II*, the Minnesota Supreme Court held that the state postconviction court abused its discretion in denying an evidentiary hearing and "remand[ed] for an evidentiary hearing on Caldwell's witness-recantation claim."  853 N.W.2d at 778; *accord Caldwell III*, 886 N.W.2d at 493-94.

> Turnage indicated that he did not really understand what perjury was, but that he was "gonna get charged with perjury any way it goes." A few questions later, the State asked Turnage: "Are you aware that in addition to perjury charges you could face charges related to aiding an offender, accomplice after the fact?" Turnage said that he was now aware. The State continued, "By doing so, you know, you could be sentenced up to half of what the Petitioner received in his case, meaning half of a life sentence if really you wanna sit there and say you lied in 2008?" Turnage laughed and said, "What is you tryin' to do, intimidate, man?"

*Id.*

At this point, the state postconviction court intervened. *Id.* After an additional colloquy with Turnage about whether he wanted to continue to testify and a bench conference with counsel, "[t]he postconviction court recessed Turnage's testimony to allow Turnage to seek counsel, and he did so." *Id.* at 496-97. When the state postconviction court resumed the evidentiary hearing a couple of months later, "Turnage was represented by counsel from the Public Defender's office. Turnage was re-sworn, invoked his Fifth Amendment privilege against self-incrimination, and refused to answer further questions. After Turnage was excused, the postconviction court struck Turnage's testimony from the record of the December evidentiary hearing." *Id.* at 497. The state postconviction court ultimately denied Caldwell's "third postconviction petition and his motion for reconsideration of the decision to strike Turnage's testimony." *Id.* at 498.

Proceeding *pro se*, Caldwell appealed the denial of postconviction relief to the Minnesota Supreme Court. *Id.* at 494, 498. In relevant part, Caldwell "argue[d] that the [state] postconviction court and the prosecutor substantially interfered with Turnage's decision to testify at the postconviction hearing, thereby violating [his] Fourteenth

7

Amendment right to due process." *Id.* at 498. The Minnesota Supreme Court affirmed the denial of Caldwell's third petition for postconviction relief. *Id.* at 494, 504.

### C. Federal Habeas Proceedings

Caldwell filed the instant Petition pursuant to 28 U.S.C. § 2254. (*See generally* Pet.) Caldwell identifies six grounds for relief: (1) ineffective assistance of trial counsel; (2) insufficient evidence to prove beyond a reasonable doubt that he committed a crime for the benefit of a gang; (3) insufficient evidence to prove beyond a reasonable doubt that Cole's death was premediated and intentional for first-degree murder; (4) violation of due process for being convicted of aiding and abetting a crime for which the principal was acquitted; (5) violation of due process and the right to present a defense at the postconviction hearing based on the prosecutor's interference with Turnage's decision to testify; and (6) violation of his right to a public trial.

The Court ordered Respondent to show cause why the writ should not be granted. (ECF No. 6.) Respondent subsequently moved for an extension of time to respond, which the Court granted. (ECF Nos. 7, 9.) Following the filing of Respondent's response and Caldwell's reply, this matter is now fully briefed and ready for a determination on the submissions. (ECF Nos. 11, 15.)

### III. ANALYSIS

### A. Exhaustion & Procedural Default: Ground 4

Citing *Rose v. Lundy*, 455 U.S. 509 (1982), Respondent argues that Ground 4 of the Petition is unexhausted and, as a result, the Petition is a mixed petition which should be dismissed in its entirety. (Resp't's Mem. at 18, ECF No. 11.)

8

## 1. Exhaustion

A state prisoner may seek a writ of habeas corpus in federal court on the ground that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But, in order for such relief to be granted, the state prisoner first must show that he "has exhausted the remedies available" in the state courts. *Id.* § 2254(b)(1)(A). To satisfy this exhaustion requirement, the state prisoner "must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)" in a manner that alerts the court to the claim's federal nature and gives "the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations and quotations omitted); *accord O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). "A petitioner must present *both* the *factual and legal* premises of his claims to the state courts in order to exhaust the claims properly." *Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014) (emphasis in original) (quotation omitted); *accord Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997). "The habeas claim need not be an exact duplicate of the one raised in the state court proceedings, but the petition must present the same legal and factual bases to the federal courts that were presented to the state courts." *Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (citation omitted).

### a. Ground 4

In Ground 4, Caldwell asserts "that his due process rights were violated when he was convicted of aiding and abetting Kirk . . . of a crime for which Kirk . . . had been acquitted after the prosecution had a full and fair opportunity to litigate the issues of [Kirk]'s intent and premeditation." (Pet. at 10.) In support of Ground 4, Caldwell states that before his own trial, Kirk proceeded to a bench trial in which the state district court judge "found that the prosecution had not proven, beyond a reasonable doubt, that [Kirk] acted with premeditation or intent." (Pet. at 10.) Caldwell asserts that, "[a]t [his] trial, in order to convict[] [him], the prosecution needed to prove exactly what it had already failed to prove at [Kirk]'s trial, that [Kirk] acted with intent and premeditation." (Pet. at 10.) Caldwell asserts that allowing his conviction of aiding and abetting first-degree murder to stand "where the princip[al] has already been acquitted calls into question the integrity of the criminal justice system." (Pet. at 10.)

### b. *Caldwell I*

The first issue identified in Caldwell's consolidated appeal was "[a] defendant who has been charged as an accomplice cannot be convicted of a crime where the principal has been acquitted of the same crime." (Resp't's App. at 75.) This argument had two prongs. The first was grounded in statutory interpretation of Minn. Stat. § 609.05, which addresses liability for crimes of another. (Resp't's App. at 76-80.) The second was based on *Standefer v. United States*, 447 U.S. 10 (1980), and the doctrine of nonmutual collateral estoppel. (Resp't's App. at 80-82.)

Similar to Kirk, the principal in *Standefer* was acquitted, albeit by a jury rather than a judge, of certain criminal counts prior to the trial of the aider and abetter. 447 U.S. at 13. Similar to Caldwell, the aider and abetter was subsequently tried and convicted of aiding and abetting those same counts. *Id.* at 11-12, 13. The aider and abetter argued that the government should be precluded from relitigating the principal's guilt in the subsequent aiding-and-abetting proceeding based on the civil doctrine of nonmutual collateral estoppel. *Id.* at 21-22. The Supreme Court first applied this doctrine in a patent action, holding "that a determination of patent invalidity in a prior infringement action was entitled to preclusive effect against the patentee in subsequent litigation against a different defendant." *Id.* at 21; *see Blonder-Tonge Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971).

In *Standefer*, the Supreme Court rejected the aider-and-abetter's argument that the government was precluded from relitigating the issue of the principal's guilt based on differences between the nature of civil and criminal cases. 447 U.S. at 22-25. The Supreme Court's discussion focused on the ability of a criminal jury "to acquit out of compassion or compromise or because of their assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Id.* at 22 (quotation omitted). The Supreme Court held that the differing results between the trials of the principal and the aider and abetter "does no more than manifest the simple, if discomforting, reality that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. While

symmetry of results may be intellectually satisfying, it is not required." *Id.* at 25 (quotations and citation omitted).

Returning to Caldwell's consolidated appeal, Caldwell argued that the doctrine of nonmutual collateral estoppel *should* apply in his case, and *Standefer* was thus inapplicable, because Kirk's trial was a bench trial with a judge, not a jury trial. (Resp't's App. at 81.)  Caldwell argued that, unlike juries, judges do not have the power of lenity in criminal cases and, "[s]ince a judge is not entitled to exercise lenity in reaching a verdict, there is no reason not to apply nonmutual collateral estoppel following a court trial, as opposed to a jury trial."  (Resp't's App. at 81.)  Caldwell argued that "the conviction of an accomplice following the acquittal of the principal following a court trial compromises the integrity of the judicial system."  (Resp't's App. at 81.)

In the consolidated appeal, the Minnesota Supreme Court addressed only the first prong, statutory interpretation of Minn. Stat. § 609.05.  *Caldwell I*, 803 N.W.2d at 382-83.  The Minnesota Supreme Court specifically noted: "Caldwell referred to the common law doctrine of nonmutual collateral estoppel in his brief.  But at oral argument, Caldwell's [then-]counsel clarified that his argument was limited to the interpretation of Minn. Stat. § 609.05, subd. 4.  Therefore, we confine our analysis to this issue."  *Id.* at 382 n.3.

### c.    Ground 4 Not Fairly Presented

Addressing the issue of exhaustion, Caldwell contends that his argument to the Minnesota Supreme Court was "that [a] defendant who has been charged as an accomplice cannot be convicted of a crime where the principal has been acquitted of the

12

same crime," and that part of that argument was "that to allow his conviction where the person he aided and abetted was acquitted of the crime compromises the integrity of the judicial system."  (Pet'r's Resp. at 23, ECF No. 15 (quotations omitted).)  Caldwell contends that "[a]t [oral] argument [then-]counsel might have said [he] waived the argument of non-mutual estoppel, but there is nothing in the record indicating any claim related to the fundamental[-]fairness . . . issue was waived, and this is the claim that [he] makes at this time."  (Pet'r's Resp. at 23-24.)  In the alternative, Caldwell "requests that any claims this Court deems unexhausted be deleted from his Petition or that he be granted leave to amend his Petition so that he may proceed with his exhausted claims," contending that "dismissal of the entire Petition could have the potential to impair Caldwell's right to obtain federal relief as to all claims because of the statute of limitations contained within 28 U.S.C. [§] 2254."  (Pet'r's Resp. at 24.)

Caldwell appears to be arguing that he presented a separate fundamental-fairness claim to the Minnesota Supreme Court apart from the issue of nonmutual collateral estoppel.  As stated above, however, the issue of fundamental fairness was raised part and parcel with the issue of nonmutual collateral estoppel, not as a separate federal claim.  *See Nash v. Russell*, 807 F.3d 892, 898 (8th Cir. 2015) ("In order to fairly present a claim, a petitioner is required to refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." (quotation omitted)).  And, as noted by the Minnesota Supreme Court, then-counsel for Caldwell waived the issue of nonmutual collateral

estoppel at oral argument. *Caldwell I*, 803 N.W.2d at 382 n.3. Thus, Caldwell has not fairly presented his fundamental-fairness claim to the Minnesota Supreme Court.

## 2.  Ground 4 Procedurally Defaulted

Moreover, any fundamental-fairness claim is now procedurally defaulted, rather than unexhausted. A claim is unexhausted if state law allows the petitioner to raise the claim by any available state court procedure. *See* 28 U.S.C. § 2254(c). But, if a petitioner has not fairly presented his claims in state court *and* a state procedural rule precludes further litigation of the claims, those claims are procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir. 1996) ("If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now."). In Minnesota, "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976). Thus, Minnesota law provides a procedural rule that denies further litigation of claims that could have been raised on direct appeal. *Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011). This rule "bars not only claims that were known at the time of direct appeal, but also claims that *should have* been known." *Sontoya v. State*, 829 N.W.2d 602, 604 (Minn. 2013) (citing *Knaffla*, 243 N.W.2d at 741). Because Caldwell raised the issue of fundamental fairness as part of his consolidated direct appeal (and subsequently waived it at oral argument), Minnesota's *Knaffla* rule bars Caldwell from pursuing it in a subsequent petition for postconviction relief, and the claim is procedurally defaulted.

14

Procedurally defaulted claims are generally barred from federal habeas review. *Coleman*, 501 U.S. at 750. The merits of a procedurally barred claim will be addressed by a federal court only when one of two narrow exceptions applies: (1) where the state "prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) where the state prisoner can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.*; *see also McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997). If neither of these exceptions applies, the merits of a procedurally defaulted claim will not be entertained by a federal court. *See, e.g.*, *Murphy*, 652 F.3d at 850 (declining to excuse petitioner's procedurally defaulted claims for failure to establish either of the procedural bar exceptions). Caldwell has not argued that any of these exceptions apply to Ground 4. In fact, Caldwell has proposed dropping Ground 4 entirely. Because Ground 4 was not fairly presented to the state courts and the *Knaffla* rule bars further litigation of this claim, Ground 4 is procedurally defaulted and must be summarily denied.

### 3.  Not a Mixed Petition

"If a habeas petition includes both exhausted claims and at least one truly unexhausted claim, i.e., a claim for which there is still an available state court remedy, then it is a 'mixed petition,' which must be dismissed without prejudice, so that the petitioner has an opportunity to exhaust his state court remedies for all of his habeas corpus claims." *Maxwell v. Gau*, No. 12-cv-1770 (ADM/TNL), 2014 WL 1371912, at *9 n.3 (D. Minn. Apr. 8, 2014) (citing *Rose*, 455 U.S. at 510, 522). "The presence of a *procedurally defaulted* claim, however, does *not* create a mixed petition that is governed

by *Rose v. Lundy*." *Id.*; *accord Abdillahi v. Miles*, No. 16-cv-0963 (JNE/HB), 2017 WL 4047859, at \*8 (D. Minn. June 29, 2017), *adopting report and recommendation*, 2017 WL 4022407 (D. Minn. Sept. 12, 2017), *appeal filed*, No. 17-3342 (8th Cir. Oct. 27, 2017).

> The inclusion of a procedurally defaulted claim does not prevent a federal habeas court from reaching the merits of any properly exhausted claims presented in the petition. Simply stated, there is a distinction between truly unexhausted claims (which can give rise to a "mixed petition" that must be dismissed without prejudice) and procedurally defaulted claims (which do not preclude a federal habeas court from reaching the merits of other, properly exhausted, claims).

*Maxwell*, 2014 WL 1371912, at \*9 n.3; *see Abdillahi*, 2017 WL 4047859, at \*8. Given that Ground 4 is procedurally defaulted, this is not a mixed petition and, therefore, the Court proceeds to Caldwell's remaining exhausted claims.

## B.  Remaining Claims: Grounds 1, 2, 3, 5, and 6

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits habeas review to adjudications that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Nash*, 807 F.3d at 896.

A state-court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court unreasonably applies clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* When deciding whether a state court decision unreasonably applied clearly established federal law, a federal habeas court should ask whether the state court's application was "objectively unreasonable." *Id.* at 409. In other words, it is not enough that a "state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

A writ of habeas corpus may also be granted if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). When reviewing a state court conviction, the state court's factual determinations are accorded substantial deference. *See* 28 U.S.C. § 2254(e)(1); *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) ("In reviewing a state conviction, a federal court also presumes that the state court's factual determinations are correct . . . ."). "The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Absent a claim that falls within the parameters of 28 U.S.C. § 2254(d), a habeas corpus petition will not prevail.

## 1.  Ground 1: Ineffective Assistance of Trial Counsel

In Ground 1, Caldwell argues that he received ineffective assistance of trial counsel in violation of the Sixth Amendment based on trial counsel's alleged deficient performance during jury selection and having met with Caldwell only three times prior to trial.  (Pet. at 4.)

### a.     Right to Effective Assistance of Counsel

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions.  The right to counsel is the right to effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 138 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).  "To establish a constitutional violation, a petitioner must show both that counsel's performance was deficient and that the deficiency prejudiced his defense." *Barnes v. Hammer*, 765 F.3d 810, 813-14 (8th Cir. 2014) (citing *Strickland*, 466 U.S. at 687); *accord Woods v. Norman*, 825 F.3d 390, 394 (8th Cir. 2016); *Williams v. Roper*, 695 F.3d 825, 830 (8th Cir. 2012).

"AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams*, 695 F.3d at 831 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011)); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam); *Barnes*, 765 F.3d at 813.  "There is a strong presumption that counsel has rendered adequate assistance and made all significant decisions for tactical reasons rather than through neglect." *Barnes*, 765 F.3d at 814; *see Woods*, 136 S. Ct. at 1152-53.  "Where a state court concludes that there was no ineffective assistance under this 'highly deferential' standard, a federal court

18

then must review counsel's performance under the 'deferential lens of § 2254(d).'"

*Barnes*, 765 F.3d at 814 (quoting *Cullen*, 563 U.S. at 190). "Under § 2254(d), the 'pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.'" *Taylor v. Kelley*, 825 F.3d 466, 470 (8th Cir. 2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *see Williams*, 695 F.3d at 831-32 ("[T]he proper question is whether there is any reasonable argument that the state court's judgment is consistent with *Strickland*.") (quotation omitted).

## b.   Voir Dire

In his consolidated appeal, Caldwell argued "that his [trial] counsel's questioning of prospective jurors was perfunctory, and that his [trial] counsel should have asked questions even if he knew that he would use a peremptory challenge." *Caldwell I*, 803 N.W.2d at 386. According to Caldwell, "the questions should have been asked in the hope of finding cause to excuse prospective jurors and thereby preserving as many peremptory challenges as possible." *Id.* Considering both the performance and prejudice prongs, the Minnesota Supreme Court concluded that Caldwell was not denied effective assistance of counsel during voir dire. *Id.* at 387.

The Minnesota Supreme Court held:

> Caldwell's trial counsel appears to have been well prepared during voir dire. Each prospective juror received and filled out a questionnaire that had 91 questions. Caldwell's [trial] counsel demonstrated on several occasions that he had read the questionnaires, and asked about some of the answers in more depth. For example, the first prospective juror started to write an answer and then scratched it out. Caldwell's [trial] counsel asked the prospective juror about this question. Caldwell's [trial] counsel also was prepared with a list of a

> number of prospective jurors whom he intended to strike. [Trial c]ounsel did assert Caldwell's right to strike jurors for cause on several occasions—sometimes successfully, and sometimes unsuccessfully. Given this course of conduct, we conclude that Caldwell has not rebutted the presumption that his [trial] counsel's performance was reasonable.
>
> Moreover, Caldwell fails to assert or demonstrate that any particular juror should have been stricken. It appears that Caldwell's trial counsel reviewed all questionnaires and determined that his existing peremptory challenges were sufficient without attempting more challenges for cause. We conclude that Caldwell has failed to demonstrate prejudice resulting from his counsel's performance in voir dire.

*Id.* at 386-87 (citations omitted).

Caldwell and Respondent both present arguments that essentially invite this Court to conduct a *de novo* review of trial counsel's performance during voir dire. (*See, e.g.*, Pet'r's Resp. at 38-39; Resp't's Mem. at 7-8.) Such an approach, however, is not proper in the habeas context. *Williams*, 695 F.3d at 831. "The proper question before the federal courts under AEDPA is whether the decision of the [Minnesota Supreme Court] . . . was contrary to, or an unreasonable application of, clearly established federal law. If the state court's determination passes muster under this standard, then [Caldwell] is not entitled to relief." *Id.*

Here, the Minnesota Supreme Court's determination easily passes muster. To begin with, Caldwell claims that the Minnesota Supreme Court's "decision [wa]s contrary to clearly established federal law." (Pet'r's Resp. at 38.) But, Caldwell does not contend, much less demonstrate, that the Minnesota Supreme Court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or claim

that the Minnesota Supreme Court decided his case differently than the Supreme Court has on materially indistinguishable facts. *See Williams*, 529 U.S. at 413.

Nor has Caldwell shown, or even argued, that the Minnesota Supreme Court unreasonably applied the two prongs of *Strickland* in his case. As the Minnesota Supreme Court pointed out, Caldwell's trial counsel reviewed the prospective juror questionnaires, following up on some of the responses; had a list of jurors he intended to strike; and attempted (both successfully and unsuccessfully) to strike jurors for cause several times. Even assuming for purposes of argument that the Minnesota Supreme Court unreasonably applied the performance prong (and it did not), i.e., that trial counsel's performance during voir dire was in fact deficient, the Minnesota Supreme Court's application of the prejudice prong would also have to be unreasonable. *See Taylor*, 825 F.3d at 470 ("Because both prongs must be met for the petitioner to succeed 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.'" (quoting *Strickland*, 466 U.S. at 697)). "If the state court reasonably could have concluded that the petitioner was not prejudiced by counsel's actions, then federal review under AEDPA is at an end." *Williams*, 695 F.3d at 832 (quotation omitted).

The Minnesota Supreme Court determined that Caldwell was not prejudiced by trial counsel's performance based on Caldwell's "fail[ure] to assert or demonstrate that any particular juror should have been stricken." *Caldwell I*, 803 N.W.2d at 387. In *White v. Luebbers*, a habeas petitioner raised a claim for ineffective assistance of counsel based on counsel's "fail[ure] to ask potential jurors any questions relating to the death

penalty."   307 F.3d 722, 727 (8th Cir. 2002).   The Eighth Circuit Court of Appeals

observed:

> Suppose counsel had followed a proper strategy and questioned the jurors thoroughly about the death penalty and other matters.   We have no idea what their answers would have been.   We have no idea what rulings the trial court would have made, for example, on challenges for cause, after hearing those answers.   And we have no idea how the makeup of the jury would have been changed, if at all.   If, for example, voir dire by defense counsel had succeeded in rehabilitating a potential juror, and a challenge for cause by the State had thereafter been overruled, the State might still have avoided that juror by exercising one of its peremptory challenges.   In short, we do not know that any person who got on the jury was prejudiced against the defendant or in favor of the death penalty, and we do not know what difference in the composition of the jury additional voir dire would have made.

*Id.* at 728.   The Eighth Circuit held that

> the likelihood of prejudice . . . [was not] inherently so great in the present situation as to justify dispensing with the usual requirement that prejudice must be shown.  Mr. White points out that his lawyer failed to ask a single question of twenty-four potential jurors who were removed for cause because they had expressed reservations about the death penalty. There is simply no way of gauging the likelihood that some of those jurors would have served on the actual trial jury if voir dire questions had been asked, nor is there any way of showing that the jurors who did actually serve were not completely fair.

*Id.* at 729.

The question before this Court "is whether there is 'any reasonable argument' that

the state court's judgment is consistent with *Strickland*."   *Williams*, 695 F.3d at 831-32

(quoting *Harrington*, 562 U.S. at 105); *accord Woods*, 825 F.3d at 395.   Based on the

record before the Court, it was not objectively unreasonable for the Minnesota Supreme

Court to conclude that Caldwell had failed to demonstrate prejudice resulting from trial counsel's alleged deficient performance in not asking additional questions when he "fail[ed] to assert or demonstrate that any particular juror should have been stricken." *Caldwell I*, 803 N.W.2d at 387; *see Krutilek v. Kenney*, 125 F. App'x 93, 95 (8th Cir. 2005) (per curiam) (*Strickland*'s prejudice prong not satisfied where petitioner had not shown seated jurors were biased notwithstanding trial counsel's failure "to follow up the jurors' equivocal answers with more questioning[]or try to have the jurors removed for cause").

### c.    Attorney-Client Relationship

In his consolidated appeal, Caldwell "also argue[d] that he was denied effective assistance of counsel by the lack of any meaningful attorney-client relationship" and trial "counsel's performance was inadequate because his [trial] counsel consulted with him only three times." *Caldwell I*, 803 N.W.2d at 387. Citing the Supreme Court's decision in *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983), the Minnesota Supreme Court noted that "the number of attorney client consultations does not alone demonstrate inadequate representation." *Caldwell I*, 803 N.W.2d at 387. The Minnesota Supreme Court held that

> it appears that Caldwell's [trial] counsel advised him competently. Caldwell stated in his affidavit that he reviewed with his [trial] counsel which witnesses would testify on Caldwell's behalf. They also discussed Caldwell's desire to reject a plea offer, to have a speedy trial, and to testify on his own behalf. Further, it appears from the record that Caldwell's [trial] counsel was well prepared and conducted a competent defense. [Trial c]ounsel cross-examined witnesses and presented an alternative theory of the case to the jury. As

23

> Caldwell's affidavit confirms, [trial] counsel sent an investigator to meet with Caldwell "a few times" to obtain information from Caldwell about the case. Finally, Caldwell also stated, in response to questioning from the district court, that he did not wish to retain new counsel. Therefore, the record does not indicate any deficiency in the relationship between Caldwell and his [trial] counsel that would establish a claim for ineffective assistance of counsel.
>
> Even if Caldwell's [trial] counsel's performance were deficient, Caldwell has not demonstrated that he suffered prejudice. He argues that prejudice is demonstrated by the fact that Kirk . . . was acquitted of the offense for which Caldwell was convicted. But different results alone do not support an inference that Caldwell's [trial] counsel's performance prejudiced him. Caldwell has not otherwise indicated how specifically he was prejudiced by his relationship with his counsel. Given the actions of Caldwell's trial counsel, we conclude that Caldwell was not denied effective assistance of counsel at his trial.

*Id.* at 387-88 (citations omitted).

Caldwell again argues that the Minnesota Supreme Court's "decision [wa]s contrary to clearly established federal law." (Pet'r's Resp. at 38.) But, here too, Caldwell does not contend that the Minnesota Supreme Court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or claim that the Minnesota Supreme Court decided his case differently than the Supreme Court has on materially indistinguishable facts. *See Williams*, 529 U.S. at 413.

The Minnesota Supreme Court cited specific examples demonstrating that trial counsel's performance was not deficient. Trial counsel's discussions with Caldwell included witnesses for Caldwell and a plea offer as well as Caldwell's desire to have a speedy trial and testify. Trial counsel also sent an investigator, who met with Caldwell

on more than one occasion to obtain information regarding the case. And, during trial, trial counsel was prepared, cross-examined witnesses, and presented an alternative theory of the case.

Yet even again assuming for purposes of argument that the Minnesota Supreme Court unreasonably applied the performance prong, i.e., that trial counsel's performance was in fact deficient, the Minnesota Supreme Court's application of the prejudice prong would also have to be unreasonable. *See Taylor*, 825 F.3d at 470. As stated above, in response to Caldwell's argument that prejudice was demonstrated by Kirk's acquittal of the offense for which Caldwell was convicted, the Minnesota Supreme Court held that Caldwell had not shown prejudice because "different results alone do not support an inference that Caldwell's [trial] counsel's performance prejudiced him" and "Caldwell ha[d] not otherwise indicated how specifically he was prejudiced by his relationship with his [trial] counsel." *Caldwell I*, 803 N.W.2d at 388.

"The prejudice prong of *Strickland* is only met where there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Taylor*, 825 F.3d at 470 (quoting 466 U.S. at 694). "To satisfy *Strickland*, the likelihood of a different result must be 'substantial, not just conceivable.'" *Williams*, 695 F.3d at 831 (quoting *Harrington*, 562 U.S. at 112). In attempting to show prejudice, Caldwell focused on the different outcome in Kirk's trial. Caldwell did not show, for example, that "further communications would have resulted in alternate strategies or lines of investigation that would have created a reasonable probability of a different outcome at trial." *United States v. Williams*, 562 F.3d 938, 942

25

(8th Cir. 2009); *see Schone v. Purkett*, 15 F.3d 785, 789-90 (8th Cir. 1994) (petitioner could not show prejudice under *Strickland* where he "failed to point out any evidence or defenses that diligent preparation of his case would have revealed"); *see also Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) (petitioner's speculation was insufficient to make the required showing of prejudice under *Strickland*).

> The requirement that a defendant show prejudice in effective representation cases arises from the very nature of the specific element of the right to counsel at issue there—*effective* (not mistake-free) representation. Counsel cannot be "ineffective" unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have).

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006); *see Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) ("The prejudice showing is in most cases a necessary part of a *Strickland* claim. The reason is that a defendant has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.' As a rule, therefore, a 'violation of the Sixth Amendment right to effective representation is not complete until the defendant is prejudiced.'" (quoting *Gonzalez-Lopez*, 548 U.S. at 147) (internal quotation marks omitted)). It was not unreasonable for the Minnesota Supreme Court to conclude that Caldwell had not satisfied the prejudice prong when Caldwell did not specifically articulate how the results of his trial would have been different but for trial counsel's conduct.

Because the Minnesota Supreme Court's determination of Caldwell's ineffective-assistance-of-counsel claim was neither contrary to clearly established federal law nor objectively unreasonable, Caldwell is not entitled to relief on Ground 1.

### 2.  Grounds 2 & 3: Insufficient Evidence

In Grounds 2 and 3, Caldwell challenges the sufficiency of the evidence used to convict him of aiding and abetting first-degree intentional murder for the benefit of a gang.

### a.    Sufficiency of the Evidence & Due Process

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979).  The standard of proof beyond a reasonable doubt "[i]s an essential of Fourth Amendment due process." *Id.* at 318; *see id.* at 316, 321.  "Under *Jackson*, a habeas petitioner is entitled to relief if [the court] conclude[s] 'that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Nash*, 807 F.3d at 897 (quoting 443 U.S. at 324).  "In applying this standard, [courts] do not re-weigh the evidence, and . . . must resolve inconsistencies in favor of the prosecution." *Id.* (citing *Jackson*, 443 U.S. at 319).  "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)) (internal quotation marks omitted).

Like claims for ineffective assistance of counsel, the Supreme Court has also characterized the standard for review of habeas claims based on sufficiency of the evidence

> as "twice-deferential" because (1) under *Jackson v. Virginia*, the state court must be deferential to a jury's verdict when an insufficiency-of-the-evidence claim is reviewed on direct appeal, and (2) under AEDPA, a federal court must be deferential to the state court's resolution of an insufficiency-of-the-evidence claim in a § 2254 habeas corpus proceeding.

*Maxwell*, 2014 WL 1371912, at *18 (citing *Parker*, 132 S. Ct. at 2152). The Supreme Court "ha[s] made clear that *Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

### b. Benefit of Gang

Minnesota law defines a gang as

> any ongoing organization, association, or group of three or more persons, whether formal or informal, that:
>
> (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;
>
> (2) has a common name or common identifying sign or symbol; and
>
> (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn. Stat. § 609.229, subd. 1. Accordingly,

> the State had to show that the "LL" gang is (1) a group of three or more persons, (2) has as its primary activity the commission of one or more of the offenses listed in Minn. Stat. § 609.11, subd. 9 (2010), (3) has a common name or symbol, and (4) includes members who have engaged in a pattern of criminal activity.

*Caldwell I*, 803 N.W.2d at 385 (footnote omitted). Offenses listed in Minn. Stat. § 609.11, subd. 9 include, among others, murder, assault, drive-by shooting, possession

of a firearm, felony drug offenses, and attempts to commit any of these crimes. *Id.* at 385 n.4 (citing Minn. Stat. § 609.11, subd. 9).

### i.    Evidence at Trial

At trial, "[s]everal individuals who were with Caldwell at the time of the shooting . . . testified.  These individuals were William Brooks, Troy Young, Cey Barber, and Carnell . . . ."  *Id.* at 379.  "With the possible exception of Brooks and Carnell, all were members of a group called the 'LL' gang, along with Kirk . . . ."  *Id.* (footnotes omitted).  While "Brooks and Carnell denied being members of the 'LL' gang, . . . other testimony suggests they were members."  *Id.* at n.1.  In addition to describing the events on the day of the shooting,

> Carnell also gave general testimony about the "LL" gang.  He testified that the "LL" gang had a hand signal, which consisted of holding up two hands to show two letter L's with the thumb and four fingers.  Carnell also testified that the "LL's" sell drugs, including crack cocaine.  He testified that the "LL's" protect their territory by fighting with or shooting at members of other gangs that come into their territory, and that they sometimes engaged in shoot-outs with other gangs including the "One Nines."  The State also introduced the photograph recovered at Caldwell's house. Carnell confirmed that Caldwell was in the picture, and was showing the "LL" gang sign with one hand.
>
> . . .
>
> Cey Barber testified that the "LL" gang had a hand gesture. Barber also testified that "LL" members sold drugs, including "weed" and crack cocaine and that "LL's" retaliated against other gangs who intruded upon their territory by "mess[ing] with their girls" and by using weapons.  Barber testified that he was with Caldwell's group on the afternoon of the shooting, and saw "Ill Will" in the other group.  Barber

> "heard some shots," "put his head down," and then heard
> Kirk . . . fire some shots.

*Id.* at 380-81.  Although not specifically recounted in the portion of its opinion describing

Brooks's testimony, the Minnesota Supreme Court correctly stated that Brooks also

testified that the "LL's" sell drugs.  (Resp't's App. at 1116.)  *Cf. Caldwell I*, 803 N.W.2d

at 380, 385.

### ii.    *Caldwell I*

As part of his consolidated appeal, Caldwell argued "that the State did not prove

beyond a reasonable doubt that the 'LL's' met the statutory definition of a gang."

*Caldwell I*, 803 N.W.2d at 385.  Caldwell did "not dispute that the 'LL' gang is a group

of three or more people, and that they have a common identifying sign or symbol."  *Id.*

The Minnesota Supreme Court noted that "[s]everal witnesses testified that at least three

of the occupants of Caldwell's SUV were members of the 'LL' gang" and "[t]here was

also testimony that the 'LL' gang had a common name and a common identifying sign,

which consisted of a hand gesture making the letter L."  *Id.*   The Minnesota Supreme

Court then turned to the evidence regarding the remaining two criteria: "whether the 'LL'

gang has, as one of its primary activities, the commission of one or more of the section

609.11, subdivision 9, offenses . . . and . . . whether it includes members who engage in a

pattern of criminal activity."  *Id.*

With respect to the commission of Minn. Stat. § 609.11, subd. 9 offenses as a

primary activity, the Minnesota Supreme Court noted that three different individuals—

Brooks, Barber, and Carnell—testified that the LLs sold drugs and there was "evidence

that the 'LL's' shot at opposing gang members who intruded on the 'LL's' territory." *Id.*;
*see id.* at 380-81.   The Minnesota Supreme Court concluded that "[t]hese activities
constitute sufficient evidence for a jury to infer that the 'LL's' had as a primary activity
the commission of one or more section 609.11, subdivision 9, offenses." *Id.* at 385-86.

The Minnesota Supreme Court similarly concluded "that there was sufficient
evidence for the jury to conclude that the 'LL' gang included members who engaged in a
pattern of criminal activity" based on evidence that two members of the LL gang "sold
drugs on the gang's territory" and evidence that "the 'LL' gang had a pattern of shooting
at members of other gangs who entered 'LL' territory." *Id.* at 386; *see id.* at 379, 380,
381.   The Minnesota Supreme Court reasoned that "[t]hese activities constitute sufficient
evidence from which a jury could infer that the 'LL's' included members who engaged in
a pattern of criminal activity." *Id.* at 386.   Based on the foregoing, the Minnesota
Supreme Court "conclude[d] that there was sufficient evidence for the jury to infer that
the 'LL's' met the statutory definition of a gang," and thus "sufficient evidence to
support Caldwell's conviction of aiding and abetting first-degree murder for the benefit
of a gang." *Id.*

### iii.    Habeas Claim

In Ground 2, Caldwell asserts that the Minnesota Supreme Court's determination
that there was sufficient evidence to support his conviction of committing a crime for the
benefit of a gang was unreasonable in light of the evidence presented.   (Pet'r's Resp. at
31-32.)   Caldwell asserts that "[w]hile there is testimony about selling drugs and fighting
with another so[-]called gang, there is nothing about the testimony that shows a requisite

primary purpose to support a conviction beyond a reasonable doubt."[5]  (Pet'r's Resp. at 31-32.)  According to Caldwell, "there is no direct evidence that the LL gang had as its main purpose one of the enumerated criminal activities."  (Pet'r's Resp. at 32.)  Caldwell asserts the fact that Kirk was acquitted of committing a crime for the benefit of a gang is evidence of the unreasonableness of the Minnesota Supreme Court's determination. (Pet'r's Resp. at 32; *see* Pet. at 6.)   In addition, Caldwell asserts that the amount of testimony related to gangs generally was prejudicial.  (Pet. at 6-7; Pet'r's Resp. at 32.)

The Court concludes that the Minnesota Supreme Court's determination was not unreasonable.  Several individuals associated with the LLs testified that the LLs sold drugs and shot at opposing gang members.  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman*, 566 U.S. at 655 (quoting 443 U.S. at 319).   When viewing the evidence in the light most favorable to the State, it was not unreasonable for the Minnesota Supreme Court to conclude that a jury could reasonably infer from the evidence that the LLs had as a primary activity the commission of one or more of the offenses listed in Minn. Stat. § 609.11, subd. 9, which include drug and weapons-related offenses, and that members of the LLs engaged in a pattern of criminal activity.  *See Cavazos*, 565 U.S. at 7 ("*Jackson*

---

[5] In the Petition, Caldwell asserts that there was insufficient evidence to support his conviction for committing a crime for the benefit of a gang because "there was no testimony or evidence presented to show that [he] or his alleged gang existed for the purpose of engaging in illegal activity nor was any evidence presented regarding any pattern of crime committed by the alleged gang."  (Pet. at 6.)  Caldwell appears to have largely abandoned this argument based on his own discussion of trial testimony regarding the LLs' drug activity and rivalry with the One-Nines.  (*See* Pet'r's Resp. at 31-32.)

says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  (quoting 443 U.S. at 319)).  Because the Minnesota Supreme Court was not unreasonable in determining that the evidence was constitutionally sufficient to support Caldwell's conviction for aiding and abetting a crime for the benefit of a gang, Caldwell is not entitled to relief on Ground 2.

### c.    Intent & Premeditation

Caldwell's conviction for aiding and abetting first-degree intentional murder for the benefit of a gang required "the State to prove that the principal—in this case, Kirk Harrison—acted with the intent to kill and the killing was premeditated."  *Caldwell I*, 803 N.W.2d at 384.  At Kirk's bench trial, the state district court judge "found that the State had failed to prove that Kirk . . . had the intent to cause the death of another."  *Id.* at 381.  For purposes of Caldwell's sufficiency-of-the-evidence claim, however, the evidence at *Caldwell's trial* had to be sufficient for the jury to reasonably infer that *Kirk* had the requisite premeditation and intent.

"Intent means that the defendant 'either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result.'"  *Caldwell I*, 803 N.W.2d at 384 (quoting Minn. Stat. § 609.02, subd. 9(4)).  "Premeditation means 'to consider, plan or prepare for, or determine to commit the act referred to prior to its commission.'"  *Id.* (quoting Minn. Stat. § 609.18).

### i. Evidence at Trial

At trial, several individuals testified about the rivalry between the LL and One-Nine gangs and what happened when individuals from these two gangs came across one another on the day of the shooting:

> P.P. met with Cole at the intersection of Eighth Avenue North and Oliver Avenue on the day of the shooting. He testified that two members of the One-Nine gang—"Willy" Watkins, also known as "Ill Will," and "Cash"—were in the group with Cole on the corner. P.P. witnessed Cole's shooting, and like B.M., saw that Caldwell was driving the SUV out of which the shots were fired. . . .
>
> . . .
>
> Brooks also testified that the "LL" gang "had a problem" with the "One-Nine" gang—the gang of which Cole's alleged companions on the day of the shooting, "Cash" and "Ill Will," were members.
>
> Brooks testified that on the day of the shooting, Caldwell was driving around in his SUV with Brooks, Kirk Harrison, Young, Barber, and Carnell. Brooks said that the group saw 15 to 20 people standing around at Eighth Avenue North and Penn Avenue, whom Caldwell identified as members of the "One-Nine" gang. Brooks testified that Caldwell's group left the SUV near the "One-Nine" gang members, but that "people [on the street] started getting rowdy," and that the members of Caldwell's group were concerned for their own safety. The members of Caldwell's group got back into the SUV and drove around the block. As they did so, Caldwell and Kirk Harrison remarked that members of the "One-Nine" gang had shot at them earlier and that they were going to get [the 'One-Nines']." Caldwell then passed a gun to Kirk Harrison, who was sitting in the rear passenger seat directly behind Caldwell. As the SUV drove back toward Oliver Avenue, Kirk Harrison leaned out a window and attempted to fire the gun. Initially the gun did not work because the safety was on, but Kirk Harrison took off the safety and shot six or

> > seven times into the crowd.  Brooks saw one of the men in the group get "hit in the face."

*Id.* at 379-80 (alteration in original).

> > Carnell testified that on the afternoon of the shooting, he, his brother Kirk Harrison, Caldwell, and Caldwell's girlfriend picked up Young, Barber, and Brooks.  After dropping off Caldwell's girlfriend, the group drove to Penn Avenue. Carnell testified that before dropping off Caldwell's girlfriend, Caldwell gave a gun to Kirk Harrison, because Caldwell did not want the police to find it in his possession.
> >
> > Carnell testified that Caldwell and Kirk Harrison had made an earlier attempt to shoot at some "One-Nine" gang members. When Caldwell and his group arrived at Eighth and Oliver, Carnell saw the group in which Cole was standing, and heard one of Caldwell's companions say that the group on the street consisted of members of the "One-Nine" gang.  Carnell heard Caldwell or Kirk Harrison say, "There go Kill Will."  At this point, Carnell testified that the group including Caldwell and Kirk Harrison got out of the SUV, and one of the two of them said, "[We] can catch them over there."  Carnell testified that he assumed that Caldwell and Kirk Harrison were going to "go shoot at the ['One-Nines']."
> >
> > Carnell testified that he left Caldwell's group for a few minutes.  When he got back to the group, he heard Kirk Harrison tell Caldwell "you should have took the shot." Caldwell responded that "it was too crowded."  They got back into the SUV, and then drove past the group of alleged "One-Nine" gang members.  The next thing Carnell heard was a shot, and when he looked up, he saw Kirk Harrison shooting out of the SUV's window.  Carnell testified that the gun that Kirk Harrison was firing was the same gun that Caldwell had handed to Kirk Harrison earlier.

*Id.* at 380 (alteration in original).  And, as stated above, Carnell also testified that the

"LL's" "sometimes engaged in shoot-outs with other gangs including the 'One[-]Nines.'"

*Id.*

> Troy Young, another member of the "LL" gang who was riding in Caldwell's SUV on the day of the shooting, also testified. Young said that he heard a shot from outside the SUV, and ducked. Shortly afterward, Young, who was sitting to the right of Kirk Harrison, heard shots being fired to his left. When the shooting stopped, Young looked up and he saw a grey handgun in Kirk Harrison's hand.

*Id.* at 381.

Similarly, "Barber testified that he was with Caldwell's group on the afternoon of the shooting, and saw 'Ill Will' in the other group. Barber 'heard some shots,' 'put his head down,' and then heard Kirk . . . fire some shots." *Id.* And, as stated above, Barber also testified that the LLs retaliated against other gangs "by using weapons." *Id.*

Turnage—who later recanted his testimony—testified to a conversation he had with Caldwell after the shooting. *Id.* Turnage testified that "'Ill Will' was a leader of the 'One-Nines.'" *Id.* Turnage "testified that Caldwell had told him that Caldwell had 'got down with One–Nines,' and agreed that 'Ill Will' was the 'intended target.'" *Id.*

### ii.    *Caldwell I*

As part of his consolidated appeal, Caldwell argued "that the State did not prove beyond a reasonable doubt that Kirk . . . had the necessary premeditation and intent to commit first-degree murder, and therefore there was insufficient evidence to support Caldwell's conviction for aiding and abetting that crime." *Id.* at 383-84. The Minnesota Supreme Court concluded that "there was sufficient evidence from which the jury could have inferred that Kirk . . . acted with intent to kill and the killing was premeditated." *Id.* at 384.

36

There was evidence that Kirk . . . was a member of the "LL" gang, and that the "LL" gang occasionally exchanged gunfire with the "One-Nine" gang. There was also evidence that Kirk . . . and his friends believed that the group that they were approaching was a group of "One-Nine" gang members, and that a fight was imminent. There was evidence that members of the "One-Nines" had shot at Kirk . . . and Caldwell sometime before the day when Cole was killed. The jury heard from Brooks that Caldwell and Kirk . . . said that they were "going to get them." Carnell testified that "One-Nine" leader "Ill Will" was in Cole's group and was the target of the shooting. Carnell also testified that his brother Kirk . . . said that he "got into it" with "Ill Will."

Carnell testified further that a few minutes before the shooting, Kirk . . . and Caldwell said that "we can catch them over there," by which Carnell understood that Caldwell and Kirk . . . were going to go shoot at "One-Nine" gang members. The jury also heard that Kirk . . . told Caldwell that Caldwell should have "took the shot." Brooks testified that Kirk . . . leaned out of the SUV window as the SUV was moving and fired into Cole's group. Initially, the gun's safety was on, and the gun did not fire. Kirk . . . disengaged the safety, and pulled the trigger again, firing into the crowd. There was evidence that Kirk . . . fired several shots and later told [Turnage] that his "intended target" was "Ill Will."

*Id.* at 384-85.[6] The Minnesota Supreme Court reasoned that "[t]he jury could have inferred from the evidence at trial that Kirk . . . had a rivalry with 'Ill Will,' that he tried earlier in the day to shoot 'Ill Will,' and that he believed he was shooting at 'Ill Will' when he fired into Cole's group." *Id.* at 385.

---

[6] It appears that there might be a word (or words) missing from the Minnesota Supreme Court's summary of Turnage's testimony in the last sentence. Earlier in the opinion, the Minnesota Supreme Court correctly notes that Turnage testified that *Caldwell*, not Kirk, told Turnage that he (Caldwell) "had 'got down with One-Nines,' and agreed that 'Ill Will' was the 'intended target.'" *Caldwell I*, 803 N.W.2d at 381. A review of Turnage's trial testimony confirms that Turnage was testifying about a conversation he had with Caldwell, not Kirk. (Resp't's App. at 1307, 1319-21.)

### iii.    Habeas Claim

In Ground 3, Caldwell asserts that the evidence was insufficient to convict him of aiding and abetting first-degree intentional murder.  Here too, the parties are essentially asking this Court to reweigh the evidence, each recounting the evidence presented at trial and arguing the inferences to be drawn therefrom.  But, when evaluating the state court's determination of whether there was sufficient evidence to support Caldwell's conviction, this Court's "review is extremely limited."  *Skillicorn v. Luebbers*, 475 F.3d 965, 977 (8th Cir. 2007); *see Nash*, 807 F.3d at 897 (*Jackson* "articulate[s] a narrow standard of review for questions of sufficiency of the evidence").  This Court does not reweigh the evidence and must resolve inconsistencies in favor of the State.  *Nash*, 807 F.3d at 897. This Court may grant habeas relief only if the Minnesota Supreme Court's determination regarding the sufficiency of the evidence for Kirk's intent to kill and premeditation is "both incorrect and unreasonable."  *Nash*, 807 F.3d at 897 (quotation omitted).

Although not entirely clear, it appears that Caldwell is arguing that the Minnesota Supreme Court's determination that there was sufficient evidence to support his conviction of aiding and abetting first-degree intentional murder was unreasonable in light of the evidence presented.  Again, the focus is on Kirk's intent to kill and premeditation.  Caldwell asserts that the State "failed to present evidence of [Kirk]'s premeditation or intent, instead presenting evidence that [Kirk] fired the gun from a vehicle in the general direction of others."  (Pet. at 8.)  According to Caldwell, "[t]he sole testimony related to intent to cause the death of a specific person came from Turnage, who testified that Caldwell told him that the intent was to kill Ill Will."  (Pet'r's Resp. at

33.)  Caldwell asserts that, after Turnage's recantation, "there is no evidence of the intent
to kill a specific victim."  (Pet'r's Resp. at 33.)  Caldwell further asserts that "[o]ther
testimony showed a lack of specific intent and premeditation because even the people in
the car said that the shooting just happened and that [Kirk] just leaned out the window
and opened fire while they were driving away from what would have been a fight with
the [One-Nine] members."  (Pet'r's Resp. at 33-34 (citations omitted).)  Lastly, Caldwell
points to Kirk's own acquittal of first-degree murder.  (Pet. at 8-9; Pet'r's Resp. at 34.)

Intent and premeditation can be inferred from the evidence.  *State v. Hurd*, 819
N.W.2d 591, 599 (Minn. 2012); *Davis v. State*, 595 N.W.2d 520, 525-26 (Minn. 1999).
Intent can be inferred from a person's conduct as well as "events occurring before and
after the crime."  *Davis*, 595 N.W.2d at 525-26.  The Minnesota Supreme Court has
"recognized three categories of evidence that are relevant to an inference of
premeditation—planning activity, motive, and the nature of the killing."  *Hurd*, 819
N.W.2d at 599.  "Planning activity consists of facts about how and what the defendant
did prior to the actual killing which show he was engaged in activity directed toward the
killing."  *Id.* at 600 (quotation omitted).  "Motive evidence can include prior threats by
the defendant to injure the victim and prior conduct of the victim known to have angered
the defendant."  *Id.* (quotations and citations omitted).  Although not required, "if motive
is present, it can help strengthen a finding that the defendant deliberated about the
killing."  *Id.* (quotation omitted).  Lastly, inferences may be drawn from the nature of the
killing "that the manner of killing was so particular and exacting that the defendant must

have intentionally killed according to a preconceived design." *Id.* at 601 (quotation omitted).

At trial, there was evidence of a rivalry between the LLs and the One-Nines and, in particular, a previous incident in which members of the One-Nines had shot at Caldwell and Kirk. *Caldwell I*, 803 N.W.2d at 379-81.  Carnell testified that his brother Kirk had previously "'got into it' with 'Ill Will,'"[7] a rival gang member with the "One-Nines." *Id.* at 379, 384.  And, on the day of the shooting, Carnell heard Caldwell or Kirk identify "Ill Will" in a group of One-Nines. *Id.* at 380, 381.

Both Brooks and Carnell testified to comments made by Caldwell and Kirk on the day of the shooting after encountering this group of "One-Nines" that they intended to retaliate.  Brooks testified Caldwell and Kirk said "they were going to get [the 'One-Nines']." *Id.* at 380 (alteration in original).  Carnell testified that either Caldwell or Kirk remarked that "[We] can catch them over there," which Carnell understood to mean that Caldwell and Kirk were going to shoot at the One-Nines. *Id.* (alteration in original). Carnell also testified that, before the shooting, he heard Kirk tell Caldwell that Caldwell should have shot at the One-Nines earlier. *Id.*

After these comments, Kirk leaned out the window and attempted to shoot at the One-Nines. *Id.*  The gun's safety was on at the time. *Id.*  Kirk subsequently "took off the safety and shot six or seven times into the crowd" of One-Nines. *Id.*

---

[7] Although not specifically recounted in the portion of its opinion describing Carnell's testimony, the Minnesota Supreme Court correctly stated that Carnell also testified that Kirk had "got into it with Will." (Resp't's App. at 1255.) *See Caldwell I*, 803 N.W.2d at 384.

Caldwell argues that "[t]he sole testimony related to intent to cause the death of a specific person came from Turnage, who testified that Caldwell told him that the intent was to kill Ill Will." (Pet'r's Resp. at 33.)  But, as the Minnesota Supreme Court pointed out, Turnage's testimony was not the only evidence at trial regarding Kirk's rivalry with "Ill Will" and his intentions on the day of the shooting.  Taken in the light most favorable to the State, the evidence at trial showed an existing rivalry between Kirk and "Ill Will"; Kirk intended to take revenge by shooting at "Ill Will"; "Ill Will" was spotted in the group of One-Nines Caldwell, Kirk, and the others came across on the day of the shooting; Kirk believed he was shooting at "Ill Will" when he fired into the group of One-Nines; and, when the gun did not go off as anticipated, Kirk took specific action to disengage the safety and fired again, multiple times.   Accordingly, even without Turnage's testimony that "Ill Will" had been the target,[8] the Minnesota Supreme Court's determination that a jury could have inferred that Kirk acted with intent to kill and the killing was premeditated was not unreasonable.  While, as Caldwell argues, the jury could have found "that the shooting just happened" based on other testimony, (Pet'r's Resp. at 33), this Court is "bound by *Jackson* to view the facts in the light most favorable to the prosecution and defer to the state courts where there is some evidence by which a 'rational trier of fact could have found proof of guilty beyond a reasonable doubt.'" *Nash*, 807 F.3d at 897-98 (quoting 443 U.S. at 324).  And to be clear, the Minnesota

---

[8] The Minnesota Supreme Court stated that Carnell also testified that "Ill Will" was the target of the shooting. *Caldwell I*, 803 N.W.2d at 384 ("Carnell testified that 'One-Nine' leader 'Ill Will' was in Cole's group and was the target of the shooting.").  Upon review of Carnell's testimony, (*see* Resp't's App. at 651, 1244-1306), this Court was unable to locate such testimony.

Supreme Court's decision was well supported and reasoned, and not just merely not unreasonable.

Because the Minnesota Supreme Court's determination that the evidence was constitutionally sufficient to support Caldwell's conviction for aiding and abetting first-degree murder was not unreasonable, Caldwell is not entitled to relief on Ground 3.

### 3. Ground 6: Public Trial

In Ground 6, Caldwell asserts that his right to a public trial was denied when his mother was excluded from the courtroom and the state district court judge locked the doors of the courtroom during jury instructions.

### a.    Trial Proceedings

Caldwell's mother disrupted the proceedings on a number of occasions. During voir dire, the state district court judge ordered her out of the courtroom:

> THE COURT: Ma'am, wait outside in the hallway, if you're going to react.
>
> [CALDWELL'S] MOTHER: Prejudiced.
>
> THE COURT: Ma'am, you're banned from the courtroom for the rest of the day.
>
> [CALDWELL'S] MOTHER: Yes, sir.
>
> THE COURT: Leave the building.
>
> [CALDWELL'S] MOTHER: Yes, sir.  Love you, son.
>
> THE COURT: All right.  Just for the record, that is the defendant's mother; is that correct?
>
> [TRIAL COUNSEL]: Correct, Your Honor.

> THE COURT: She is the one that I was admonishing during the questionnaire and that is the third time I've had to correct her and just so if you want to pass along, [trial counsel], if there is any more—and for the record, she has been reacting to every juror's questions. She's been shaking her head yes or no or any number of responses. I've been letting her go because it's my understanding she's on the witness list and would be sequestered during the trial anyway so I wanted to at least have her be here for jury selection, but just so the record is clear on why I just ejected her from the courtroom.
>
> [PROSECUTOR]: I don't know that it would have made the record that her exclamation just now was, Jesus, and then prejudice.
>
> THE COURT: That is correct. . . .

(Resp't's App. at 843-44.)

The following day, the state district court judge had a conversation with

Caldwell's mother on the record:

> [CALDWELL'S] MOTHER: . . . . And I'd like to apologize to you and I'd like to apologize to the Court. Really, I'm sorry for yesterday.
>
> THE COURT: Well, I'm just going to tell you something, it actually, you should apologize to your son because—
>
> [CALDWELL'S] MOTHER: I do apologize to you too, sweetheart, I do.
>
> THE COURT: What happens when you do that, jurors don't like that, and so what you're doing is you're hurting his case when you react to testimony and when you react to what's going on in the courtroom.
>
> [CALDWELL'S] MOTHER: I am sorry.
>
> THE COURT: Okay. We have a lot of experienced lawyers who will tell you the same thing. It doesn't—first of all, it disrupts the proceedings. And, second, it doesn't help your

son's case at all, in fact, it hurts it.  So, obviously, you want to do well by your son.  What you can do for him is keep the poker face and not react.

 I'm going to let you stay during this part.  I am going to give you kind of a warning, though, is that when we go into trial, witnesses are all subject to a sequestration order, you cannot—

[CALDWELL'S] MOTHER: --say a word.

THE COURT: Well, no, you cannot watch other witnesses testify.  I've been notified that you are on the witness list, and unless and until you testify, you're not going to be able to watch the testimony of other witnesses.

[CALDWELL'S] MOTHER: Yes, sir.

THE COURT: And that's not in any reaction to what you did, that's because that's the rule for all witnesses that are on the witness list in a case.  So when we start evidence, you're not going to even be a spectator, but it's not as a punishment.

[CALDWELL'S] MOTHER: I understand.

THE COURT: Do you have any questions about that?

[CALDWELL'S] MOTHER: Yes, sir.

THE COURT: I will let you come back for final argument because then the evidence is all in, and if you do testify, then you might be able to come in after your testimony.  Until then, you can't be in the courtroom.  But today during jury selection, I will allow you to be here.

[CALDWELL'S] MOTHER: Thank you.

(Resp't's App. at 882-84.)

On the first day of trial, Caldwell's mother filed a motion *pro se*, requesting, among other things, a mental examination of Caldwell.  (Resp't's App. at 908.)  After

44

Caldwell stated on the record that he did not wish to pursue the motion, Caldwell's

mother interjected:

> [CALDWELL'S] MOTHER: I'm going to object and get put
> out because I already stated that I'm his mom and you're
> taking advantage of him. I'm going to file another motion.
>
> THE COURT: Ms. Stroud Caldwell—
>
> [CALDWELL'S] MOTHER: He does not understand what's
> going on.
>
> THE COURT: Ms. Stroud Caldwell, you're going to have to
> leave.
>
> [CALDWELL'S] MOTHER: I am, because he does not
> understand what's going on.
>
> THE COURT: Okay. Now, make sure you take all your
> things because you can't come into the—
>
> [CALDWELL'S] MOTHER: I am.
>
> THE COURT: --courtroom after today.
>
> [CALDWELL'S] MOTHER: He does not understand what's
> going on. This is misconduct.
>
> THE DEPUTY: Ma'am.
>
> [CALDWELL'S] MOTHER: He can fire that lawyer.
>
> THE COURT: The record should also reflect Ms. Stroud
> Caldwell just stated out in the hallway that she should fire her
> lawyer—that she should fire the lawyer in the presence of the
> jury.
>
> . . .
>
> [TRIAL COUNSEL]: Here's my concern. This is the second
> time that she's indicated to this jury in front of them, and the
> first time, of course, none of them were present, and the

45

> second time, and it's been, quite frankly, difficult for me because this is, in my position on whether she should be here or not, it is my client's mother. I think that maybe we should, I don't know if we should do something about those comments if it in any way prejudices him in the sense of a fair trial if she is yelling out that I should be fired twice now and—
>
> THE COURT: If you want, I'll instruct the jury they should disregard any comments they will hear or have heard related to the case or the parties or the participants.
>
> [TRIAL COUNSEL]: I think there should be some type of cautionary instruction.
>
> THE COURT: Okay. I'm willing to do that as part of my initial charge to the jury. . . .

(Resp't's App. at 913-15.) Shortly thereafter, the state district court judge informed the deputy that Caldwell's mother was "not to be on the floor even." (Resp't's App. at 916.) After the lunch break, the state district court judge noted on the record:

> THE COURT: Just a couple of housekeeping matters. I would note that when we started today, we dealt with what alleged to be a pro se motion, and Ms. Stroud Caldwell engaged in a short outburst and was then ordered out of the courtroom. Since then she came back into the courtroom and was talking with people in the audience loud enough that I could hear her talking but not make out what she was saying.
> Based on that, just so the parties are aware, I have ordered that she not be allowed on the Seventh Floor for the remainder of the trial. If there are any further problems anywhere else in the Government Center, I will quickly ban her from the Government Center, but I don't think that's necessary at this time. . . . .

(Resp't's App. at 1005-06.)

Two days later, the state district court judge had another conversation with Caldwell's mother:

THE COURT: Ms. Stroud Caldwell, will you step forward, please.

Ma'am, I banned you from this floor for the duration of the trial.

[CALDWELL'S] MOTHER: I thought just the trial.

THE COURT: Well, we are in trial right now.

[CALDWELL'S] MOTHER: I was out there, though.

THE COURT: You are not to be on this floor at any time.

[CALDWELL'S] MOTHER: I wasn't—

THE COURT: Don't interrupt me.  Until this trial is concluded and a verdict has been returned.  If a verdict is not guilty, there will be no further proceedings, so it won't be an issue.  If there is a guilty, there would be a sentencing and you may attend that.  You may not attend anything else.  Your presence here was disruptive on other occasions.  I don't want you in this courtroom or on this floor.  Is that clear?

[CALDWELL'S] MOTHER: Yes, sir.  May I ask what day the verdict, what day that's going to be?

THE COURT: We don't know until the jury deliberates.

[CALDWELL'S] MOTHER: Will that be today?

THE COURT: No, it will not be today.  In any case, you are not to be here for the return of the verdict.  I'm not going to have any disruptions when the verdict comes back.  Your behavior before has been disruptive, so I'm not going to allow you to be for the verdict.  You can be here for sentencing if there is one.

[CALDWELL'S] MOTHER: There won't be one.

THE COURT: So until the duration of this trial, you're not to be on the seventh floor of the Government Center.  The next time we find you on the floor, you will be arrested.

47

[CALDWELL'S] MOTHER: Okay.

THE COURT: Do you understand that?

[CALDWELL'S] MOTHER: Yes, sir.

THE COURT: Okay.  You are free to leave now.

[CALDWELL'S] MOTHER: Thank you.

(Resp't's App. at 1361-63.)

Prior to instructing the jury, the state district court judge locked the doors of the courtroom: "Just a note to the people in the audience.  The door will now be locked, and so if you want to leave during instructions, you must do it now, you will not be able to leave while the instructions are being given. . . ."  (Resp't's App. at 1474.)

### b.  *Caldwell I*

As part of his consolidated appeal, Caldwell argued that excluding his mother from the courtroom and locking the courtroom doors prior to instructing the jury violated his right to a public trial.  *Caldwell I*, 803 N.W.2d at 390.  Recognizing that Caldwell had both a state and federal constitutional right to a public trial, the Minnesota Supreme Court held that the state district court did not err.  *Id.*  The Minnesota Supreme Court noted "that a trial court may, in the appropriate exercise of its discretion, exclude spectators when necessary to preserve order in the courtroom."  *Id.* (quotation omitted).  The Minnesota Supreme Court also noted "that the values sought to be protected by a public trial are protected when not all spectators are excluded from the courtroom."  *Id.* (quotation omitted).   The Minnesota Supreme Court concluded that there was no

violation because "the district court excluded only Caldwell's mother when she repeatedly disrupted court proceedings, and never excluded all spectators from the courtroom even when the court locked the courtroom room doors." *Id.*

### c.   Habeas Claim

In Ground 6, Caldwell argues that the Minnesota Supreme Court's decision was contrary to clearly established federal law, including *Waller v. Georgia*, 467 U.S. 39 (1984), and *Presley v. Georgia*, 558 U.S. 209 (2010).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial . . . ." U.S. Const. amend. VI. "'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . .'" *Waller*, 467 U.S. at 46 (alteration in original) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1974)) (internal quotation omitted). "[T]he right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused." *Weaver*, 137 S. Ct. at 1910.

Nevertheless, "the [Supreme] Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45; *accord Presley*, 558 U.S. at 213. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45; *accord Presley*, 558 U.S. at 213.

49

> "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

*Waller*, 467 U.S. at 45 (quoting *Press-Enter. Co. v. Superior Court of Cal.*, 464 U.S. 501, 510 (1984)); *accord Presley*, 558 U.S. at 214. Thus, "[t]hough these cases should be rare, a judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so." *Weaver*, 137 S. Ct. at 1909.

Fatal to Caldwell's claim, however, is the fact that *Waller* and *Presley* involved complete closures of the courtroom. In *Waller*, the state "court ordered the suppression hearing closed to all persons other than witnesses, court personnel, the parties, and the lawyers." 467 U.S. at 42. In *Presley*, the state court closed the courtroom to all spectators, including the defendant's uncle, during voir dire of prospective jurors. 558 U.S. at 210. Here, as the Minnesota Supreme Court correctly observed, not all spectators were excluded from the courtroom. *Caldwell I*, 803 N.W.2d at 390. Only Caldwell's mother was excluded, after repeated disruptions and warnings. And, when the state district court judge locked the doors to the courtroom during jury instructions, members of the public already present were allowed to remain. Thus, any closure amounted to a partial, not complete, closure.

"[A]s the Eighth Circuit has recognized, the Supreme Court has never addressed the lawfulness of partial closures." *Irby v. Smith*, No. 15-cv-1997 (PJS/TNL), 2016 WL 3255019, at *2 (D. Minn. June 13, 2016) (citing *Garcia v. Bertsch*, 470 F.3d 748, 754

(8th Cir. 2006)) (footnote omitted); *see, e.g.*, *Russ v. Jones*, No. 5:16cv40/LAC/EMT, 2017 WL 1030214, at *4 (N.D. Fla. Feb. 13, 2017) ("No United States Supreme Court holding embodies the legal principle at issue in this case—whether a trial[] court's partial closure of a courtroom (i.e., closure of only portions of the trial to some members of the public) violates a defendant's Sixth Amendment right to a public trial." (citation omitted)); *Alarcia v. Remington*, No. SA CV 10-447-PSG (SH), 2010 WL 3766337, at *8 (C.D. Cal. Sept. 10, 2010) ("Petitioner has failed to cite, and the Court has been unable to locate, a single United States Supreme Court case which addresses the Sixth Amendment right to a public trial in the context of a partial closure, such as where the trial court excluded certain witnesses from proceedings that were open to the general public."). Caldwell himself acknowledges that neither *Waller* nor *Presley* is directly on point, stating "[n]either of these cases contains language indicting [sic] they do not apply to disruptive spectators, or even to limited closures like locking the courtroom doors. . . ." (Pet'r's Resp. at 36.)  Several circuit courts of appeal have rejected habeas claims based on partial closures, distinguishing them from *Waller.  See, e.g.*, *Enriquez v. Sec'y*, 662 F. App'x 650, 654-56 (11th Cir. 2016) (per curiam); *Drummond v. Houk*, 797 F.3d 400, 402-04 (6th Cir. 2015); *Angiano v. Scribner*, 366 F. App'x 726, 726-27 (9th Cir. 2010) (mem.); *Garcia*, 470 F.3d at 754.  And, the Supreme Court has stated that when "none of [its] cases confront 'the specific question presented by th[e] case,' the state court's decision could not be 'contrary to' any [of its] holding[s]." *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (per curiam) (quoting *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam)).

Accordingly, because the Minnesota Supreme Court did not arrive at a conclusion opposite of the Supreme Court on a question of law or decide Caldwell's case differently than the Supreme Court has on a set of materially indistinguishable facts, the Minnesota Supreme Court's determination that Caldwell's constitutional right to a public trial was not violated is not contrary to clearly established federal law, and Caldwell is not entitled to habeas relief on Ground 6.

### 4. Ground 5: Postconviction Witness

Lastly, in Ground 5, Caldwell argues that his right to due process was violated when, during postconviction proceedings, the prosecutor threatened Turnage with perjury, resulting in Turnage electing to invoke his rights under the Fifth Amendment rather than testify on Caldwell's behalf.

### a. Postconviction Proceedings

In relevant part, Caldwell asserted in his third petition for postconviction relief that "Turnage presented false testimony at his trial." *Caldwell III*, 886 N.W.2d at 494. The state postconviction court held an evidentiary hearing at which Turnage was called to testify. *Id.* at 495. After Turnage was sworn in, the state postconviction court generally instructed Turnage on perjury and advised him of his right not to incriminate himself. *Id.* at 495-96. The state postconviction court asked Turnage if he understood his rights and whether he needed time to speak to an attorney. *Id.* at 495. Turnage responded that he understood his rights and, after inquiring as to whether it would prolong the proceedings, "said he did not want to talk to an attorney." *Id.* at 495.

52

Following that colloquy, Caldwell's counsel began his examination of Turnage. Turnage recanted his previous trial testimony, explaining that he had not seen Caldwell on the day of the shooting and had never seen Caldwell with a gun. Additionally, Turnage stated that he did not visit a friend's house with Caldwell on the day of Cole's death or hear Caldwell say he "got down with the One–Nines" at that time. Turnage also explained why his testimony had changed since the trial in 2008. According to Turnage, he was young at the time that he testified and was "intimidated about it."

On cross-examination, the State proceeded to question Turnage about the change in his testimony. The State recounted how Turnage testified under oath at trial and agreed to tell the truth in exchange for a lesser sentence on a separate charge he was facing. Turnage explained that he did not tell the truth at trial. During his testimony, however, Turnage expressed confusion about his right to refrain from answering questions that might incriminate him. The postconviction court at one point told Turnage that he had to answer a question unless he thought it would incriminate him in some way. Turnage responded that he was already incriminated and that he did not know what was going on. Turnage also testified that he suffered a traumatic brain injury resulting in long-term memory loss, so he was unable to recall his previous testimony. When the prosecutor reminded him of his previous testimony in the form of a question, Turnage said he could recall his trial testimony.

The State then attempted to show why Turnage might have changed his testimony. The State asked Turnage if he was approached in prison about his testimony and if he recalled providing multiple statements to investigators that two prisoners threatened to stab him if he did not change his testimony. Turnage said, "No," and immediately asked the court whether he had to continue answering the State's questions. At that time, the postconviction court reminded Turnage:

> [Y]ou do have to answer the questions unless they would incriminate you. If you think this would get you charged with a crime you can refuse to answer if you want, but it's gotta be

> something that would incriminate you and get
> you into trouble.    But, providing the
> information, since you have chosen to testify, is
> something you have to do.

Turnage asked if he was going to be "incriminated more" as a
result of testifying, and if he could just say "I plead the Fifth
or somethin' like that."  The postconviction court explained
that it tried to communicate this point to Turnage earlier:

> In slang it's called pleading the Fifth. . . . it says
> that you can't . . . be forced to incriminate
> yourself.  So, if you think your answer will
> incriminate you, you don't have to answer.
> And, you just tell me that you refuse to answer
> on Fifth Amendment grounds.  So if you say
> that, that's what I'm gonna know you're doin';
> all right?

Turnage replied, "Sure thing."

The State continued its cross-examination and at one point
asked Turnage if he acknowledged that he was perjuring
himself now on the stand or did so at the trial in 2008.
Turnage indicated that he did not really understand what
perjury was, but that he was "gonna get charged with perjury
any way it goes."   A few questions later, the State asked
Turnage: "Are you aware that in addition to perjury charges
you could face charges related to aiding an offender,
accomplice after the fact?"   Turnage said that he was now
aware.  The State continued, "By doing so, you know, you
could be sentenced up to half of what the Petitioner received
in his case, meaning half of a life sentence if really you
wanna sit there and say you lied in 2008?"  Turnage laughed
and said, "What is you tryin' to do, intimidate, man?"

The postconviction court then intervened and told Turnage,
"Whether the State . . . can charge you or not is not something
that they can't say for sure right now."  Turnage asked if he
was "gonna get the half of a life sentence?" to which the court
responded,

[N]o. I—I just wanna be clear that [the State's attorney] may believe he can charge you, but whether he can or not is a different story. And if you—if that changes your mind on how you wanna testify I would throw it to you to understand that whether or not—I don't know if he can charge you or not, but when he's told you that does that change your mind about whether you wanna continue to testify?"

Turnage said, "yeah, I change my mind, I don't want no positives no more. So is that good enough?"

After a bench conference with counsel, the following exchange occurred:

THE COURT: Okay.   Mr. Turnage, your testimony so far is—will stand. In other words, you can't unring a bell; okay? So, your testimony will stand. The Prosecutor's gonna continue to ask you questions. You still have the right for each individual question to decide whether you're gonna refuse to answer on Fifth Amendment grounds; okay? So, when he asks a question make the decision if you're gonna answer it or whether you're gonna refuse to answer on Fifth Amendment grounds; okay?

THE WITNESS: So if—well—because I—what I'm sayin' is this: Cause he—he—I don't know, I don't understand what's goin' on, he talkin' about all this other stuff too much and ha—life sentences and half a this and perjury and all this type of stuff.   I don't want no positives, sir.

THE COURT: Okay. Earlier you told me that you—you were fine goin' ahead without a lawyer; where are you at on that right now?

THE WITNESS: But if this gonna cause this I'm probably gonna need a lawyer.   I didn't know—I mean, I didn't know this was gonna

> get to—turned into all this and all this type of
> stuff. I mean, like, I don't know; I don't know.
> He axed [sic] me all these questions I don't
> know nothin' about; I don't know what's goin'
> on.

The postconviction court recessed Turnage's testimony to
allow Turnage to seek counsel, and he did so. Caldwell's
counsel noted on the record that he "thought there was some
intimidation going on" regarding the "potential charges of
aiding an offender after the fact." The postconviction court
determined that the prosecutor was not "attempting to
intimidate," but rather was "vigorously cross examining on
the witness'[s] possible exposure by testifying differently
from trial and in a way that would benefit the [d]efendant."
The postconviction court explained, however, that the cross-
examination

> led to the point where it was clear to the [c]ourt
> that the witness needed legal counsel at that
> point because he seemed uncertain on how he
> should proceed. And so, [the court] thought it
> appropriate that [it] break, arrange for counsel
> for him, and reconvene at a later date.

*Id.* at 495-97 (alteration in original); *see id.* at 501-02.

When the hearing resumed a couple of months later, "Turnage was represented by

counsel from the Public Defender's office. Turnage was re-sworn, invoked his Fifth-

Amendment privilege against self-incrimination, and refused to answer further

questions." *Id.* at 497. "After Turnage was excused, the postconviction court struck

Turnage's testimony from the record of the December evidentiary hearing." *Id.*

### b.  *Caldwell III*

Appealing the denial of postconviction relief, Caldwell argued in relevant part

"that the objected-to cross examination by the prosecutor interfered with Turnage's

decision to testify at the evidentiary hearing because the prosecutor impermissibly threatened to prosecute Turnage for aiding an offender if he testified falsely." *Id.* at 501. The Minnesota Supreme Court construed Caldwell's argument as claiming interference with his right to present a complete defense under the Fourteenth Amendment and assumed without deciding that this right also applied to postconviction proceedings. *Id.* at 499.

> The Minnesota Supreme Court stated:
>
>> In a criminal trial, "'a due process violation does not arise merely . . . because the government warns a defense witness of the consequences of committing perjury.'" *McKenzie [v. State]*, 872 N.W.2d [865,] 872 [(Minn. 2015)] (quoting *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)). A warning of possible self-incrimination violates due process—i.e., substantially interferes with a witness's decision to testify—if the warning is "given in a fashion that exerts 'such duress on the witness'[s] mind as to preclude him from making a free and voluntary choice whether or not to testify.'" *Id.* at 873 (alteration in original) (quoting *Webb [v. Texas]*, 409 U.S. [95,] 98[ (1972)]). "Factors to consider when determining whether a government actor's action substantially interferes with a witness's decision to testify include 'the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor or judge's basis in the record for believing the witness might lie.'" *Id.* (quoting *U.S. v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999)). "Courts have not found due process violations in cases in which there was a high probability that the witness would commit perjury, . . . and those in which the defense witness was independently represented by counsel." *Id.*

*Caldwell III*, 886 N.W.2d at 500-01. The Minnesota Supreme Court recognized that whether the prosecutor substantially interfered with Turnage's decision to testify was "an extremely fact specific inquiry." *Id.* at 502 (quotations omitted).

Noting the case was "a closer call," the Minnesota Supreme Court held "that the prosecutor's line of questioning did not substantially interfere with Turnage's decision to testify." *Id.* The Minnesota Supreme Court concluded that "[t]he prosecutor's cross-examination was inartful at times, but did not cross the constitutional line." *Id.* Additionally, Minnesota Supreme Court pointed out that the state postconviction court "specifically found that the prosecutor was not attempting to intimidate Turnage, but rather to vigorously cross-examine him," and "was in the best position to make such a determination, having heard the tone of the questioning." *Id.* The Minnesota Supreme Court further reasoned that, even if the prosecutor had substantially interfered with Turnage's decision to testify, Caldwell had not shown that he was prejudiced because "Turnage's testimony standing alone, would not have been enough to satisfy the *Larrison* standard for a new trial."[9] *Id.*

### c.    Habeas Claim

Caldwell asserts that Turnage's invocation of the Fifth Amendment and subsequent refusal to testify further during the postconviction proceedings was the result of being threatened by the prosecutor and such threats violated due process, namely, Caldwell's right to present a defense. (Pet. at 12.) Caldwell asserts that the threatening

---

[9]

> Under *Larrison* [*v. United States*, 24 F.2d 82 (7th Cir. 1928)], a petitioner is entitled to a new trial based on false trial testimony if: (1) the court is reasonably well satisfied that the testimony given by a material witness was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know that the testimony was false until after trial.

*Caldwell II*, 853 N.W.2d at 772; *see Caldwell III*, 886 N.W.2d at 501 n.5 (noting, while "*Larrison* has been overruled, *see United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004)," the test is still applied "in cases involving witness recantation and false testimony").

nature, and thus illegitimate purpose, of the prosecutor's cross-examination is evidenced in the fact that Turnage's testimony in the postconviction proceedings was more than three years after his testimony at Caldwell's trial and, therefore, he could not have been convicted of perjury based on the statute of limitations. (Pet'r's Resp. at 26.) Caldwell asserts that

> [i]n a case where the prosecution bought and paid for Turnage's testimony by giving him probation on an aggravated robbery charge in the first[]place, this was substantial interference and [the] decision of the Minnesota Supreme Court that it was not is contrary to clearly established federal law and an unreasonable determination of fact in light of the record presented.

(Pet'r's Resp. at 29-30.)

In *Washington v. Texas*, the Supreme Court observed that "[t]he right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights we have previously held applicable to the States." 388 U.S. 14, 18 (1967). The Supreme Court held:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19.

Five years later, in *Webb v. Texas*, the Supreme Court held that a trial judge's admonishment to the sole defense witness regarding the dangers of perjury deprived the

defendant of due process when the witness refused to testify.  409 U.S. 95, 98 (1972) (per curiam).

> The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury.  But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth.  Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole.  At least some of these threats may have been beyond the power of this judge to carry out.  Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify.

*Id.* at 97-98 (footnote omitted).  Based on *Washington*, the Supreme Court held that "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived [the defendant] of due process of law under the Fourteenth Amendment."  *Id.* at 98.

Significantly, *Washington* and *Webb* both occurred in the context of *trial*.  Caldwell has not cited to, and this Court's research has not uncovered, any Supreme Court precedent addressing a due-process claim based on government interference with a defense witness in the *postconviction* context.  *Cf. Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) ("right to due process [in postconviction context] is not parallel to a trial right, but rather must be analyzed in light of the fact that [the individual] has already been found guilty at a fair trial, and has only a

60

limited interest in postconviction relief"). Accordingly, as stated above, when there is no Supreme Court case confronting the specific question, the state court's decision cannot be contrary to any of its holdings. *Woods*, 135 S. Ct. at 1377. This is true even "if the circumstances of a case are . . . 'similar to' [the Court's] precedents." *Id.* Thus, even assuming for purposes of argument, the prosecutor's remarks were of the same tenor as the trial judge in *Webb*, the Minnesota Supreme Court's decision was not contrary to clearly established federal law for purposes of habeas review.

Caldwell's remaining argument is that the Minnesota Supreme Court unreasonably determined that the prosecutor did not substantially interfere with Turnage's decision to testify. The Minnesota Supreme Court's factual determinations are presumed correct and Caldwell "has the burden of rebutting this 'presumption of correctness by clear and convincing evidence.'" *Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014) (quoting 28 U.S.C. § 2254(e)(1)). "'This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations.'" *Id.* (quoting *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)). "[A] state court decision involves an unreasonable determination of the facts in light of the evidence presented in state court proceedings only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." *Whitehead v. Dormire*, 340 F.3d 532, 536 (8th Cir. 2003) (quotation and citations omitted).

"It is not improper *per se* for a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of

perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Risken*, 788 F.2d 1361, 1370 (8th Cir. 1986) (quotation omitted)); *accord United States v. Anwar*, 428 F.3d 1102, 1113 (8th Cir. 2005). Before concluding that the prosecutor did not substantially interfere with Turnage's decision to testify, the Minnesota Supreme Court noted that this case was a "closer call." *Caldwell III*, 886 N.W.2d at 502. But, even if this Court were to agree with Caldwell that substantial interference occurred (and it is far from clear that it did), the Minnesota Supreme Court's determination must also be unreasonable for habeas relief.

In concluding that the prosecutor's "inartful" cross-examination "did not cross the constitutional line," the Minnesota Supreme Court relied on the state postconviction court's finding based on first-hand observation of the prosecutor's exchange with Turnage. *Id.* at 502. The Minnesota Supreme Court stated that the state postconviction court "was in the best position" to determine whether Turnage was being intimidated, "having heard the tone of the questioning," and "specifically found that the prosecutor was not attempting to intimidate Turnage, but rather to vigorously cross-examine him." *Id.* Caldwell has not shown by clear and convincing evidence that the Minnesota Supreme Court's determination lacked support in the record, and thus has not shown that it was unreasonable. *See Whitehead*, 340 F.3d at 536.

Because the Minnesota Supreme Court's determination regarding Plaintiff's due-process claim based on interference by the prosecutor with Turnage's testimony was

62

neither contrary to clearly established federal law nor unreasonable, Caldwell is not entitled to relief on Ground 5.

## IV. CERTIFICATE OF APPEALABILITY

A habeas corpus petitioner filing a petition under 28 U.S.C. § 2254 cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A Certificate of Appealability may be granted only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  In order to do so, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, it is highly unlikely that any other court would treat Caldwell's current claims for relief differently than they are being treated here.  Caldwell has not identified (and this Court cannot discern) anything novel, noteworthy, or worrisome about this case that warrants appellate review.  It is therefore recommended that Caldwell should not be granted a Certificate of Appealability in this matter.

[Continued on next page.]

## V. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Caldwell's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (ECF No. 1) be **DENIED**.

2. This action be **DISMISSED WITH PREJUDICE**.

3. Caldwell should **NOT** be granted a Certificate of Appealability.


Date:  April___6___, 2018                    _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota


                                             *Caldwell v. Miles*
                                             Case No. 17-cv-1971 (SRN/TNL)


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).