# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Lincoln Lamar Caldwell,<br><br>               Petitioner,<br><br>v.<br><br>Eddie Miles,<br>Warden Stillwater Correctional Facility,<br>Minnesota,<br><br>               Respondent. | Case No. 17-cv-1971 (SRN/TNL)<br><br>**MEMORANDUM OPINION AND ORDER** |

Zachary A. Longsdorf, Longsdorf Law Firm, PLC, 5854 Blackshire Path, Suite 3, Inver Grove Heights, MN 55076, for Petitioner.

Linda K. Jenny, Assistant County Attorney, Hennepin County Attorney's Office, 300 South Sixth Street, Suite C-2000, Minneapolis, MN 55487, for Respondent.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Petitioner Lincoln Lamar Caldwell's Objections [Doc. No. 17] to United States Magistrate Judge Tony N. Leung's April 8, 2018 Report and Recommendation [Doc. No. 16] ("R&R"). The magistrate judge recommended that Petitioner's 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 1] ("Petition") be denied, the action be dismissed with prejudice, and a Certificate of Appealability be denied. (R&R at 6.). For the reasons set forth below,

Petitioner's objections are overruled, the Court adopts the R&R in its entirety, denies a Certificate of Appealability, and dismisses this matter with prejudice.

## II.   BACKGROUND

The factual and procedural background of this matter is well documented in the R&R and is incorporated herein by reference. This Court will recite background facts only to the extent necessary to rule on Petitioner's objections.

### A.  State Court Proceedings

In 2008, Petitioner was convicted in Hennepin County District Court on six counts of murder.[1] (*See* Pet. at 1; *State v. Caldwell*, 803 N.W.2d 373, 379, 381 (Minn. 2011) ("*Caldwell I*"). Caldwell was the driver of an SUV involved in a drive-by shooting that killed Brian Cole. *State v. Caldwell*, 853 N.W.2d 766, 768 (Minn. 2014) ("*Caldwell II*"). Both Caldwell and one of his passengers, the shooter, Kirk Harrison, were members of the LL gang, rivals of the One-Nine gang. *Id.* Although Cole was not a member of either gang, he was standing near members of the One-Nine gang when Harrison shot him. *Id.*

---

[1] The six charges on which the jury convicted Caldwell were: (1) first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2010); (2) first-degree premeditated murder for the benefit of a gang in violation of Minn.Stat. § 609.185(a)(1) and Minn. Stat. § 609.229 (2010); (3) first-degree drive-by murder in violation of Minn.Stat. § 609.185(a)(3) (2010); (4) first-degree drive-by murder for the benefit of a gang in violation of Minn.Stat. § 609.185(a)(3) and Minn. Stat. § 609.229; (5) second-degree drive-by murder in violation of Minn. Stat. § 609.19, subd. 1 (2010); and (6) second-degree drive-by murder for the benefit of a gang in violation of Minn. Stat. § 609.19, subd. 1(2) and Minn. Stat. § 609.229, subds. 2, 3. *State v. Caldwell*, 803 N.W.2d 373, 379 (Minn. 2011) ("*Caldwell I*").

At Petitioner's jury trial, the prosecution presented evidence regarding the LL gang, including evidence about hand signs, drug activities, and the rivalry with the One-Nine gang. *Caldwell I*, 803 N.W2d at 379–81. A witness confirmed that a photograph of Caldwell showed him displaying the LL gang sign. *Id.* at 380. The prosecution called numerous trial witnesses, some of whom were in Caldwell's SUV at the time of the shooting, including Carnell Harrison[2] and William Brooks, and some of whom were not present at the shooting, but discussed the shooting with Caldwell afterwards, including Shawntis Turnage. *Id.*

Turnage testified that at a party shortly after the shooting, he encountered Caldwell, who recounted "g[etting] down" with the One-Nines, which Turnage understood to mean "fighting or shooting or [a] brawl or something." *Caldwell II*, 853 N.W.2d at 768. Turnage also testified that Caldwell had explained that a One-Nine gang leader known as "Ill Will" had been the intended target of the shooting, and Caldwell had described the gun used in the shooting as a "grey and black Smith & Wesson" 9 mm semiautomatic pistol that Turnage knew Caldwell possessed. *Id.*

Caldwell was represented by counsel during his jury trial. Prospective jurors completed a 91-question questionnaire, and during voir dire, defense counsel demonstrated his familiarity with the completed questionnaires by asking some particularized questions of the venire. *Caldwell I*, 803 N.W.2d at 386–87. Defense counsel also prepared a list of a number of prospective jurors whom he planned to strike, and moved to strike several jurors for cause, with some success. *Id.* at 387.

---

[2] Carnell Harrison was the brother of the shooter, Kirk Harrison.

Also, during trial, Caldwell's mother disrupted the proceedings on a number of occasions, for which she was initially temporarily barred from the courtroom, and later banned from the courtroom for the duration of the trial. (*See* R&R at 42–47.) Prior to delivering the final jury instructions, the district judge permitted members of the public an opportunity to leave the courtroom, but then locked the doors of the courtroom during the final jury instructions. (*Id.* at 48.)

As noted, the jury ultimately convicted Caldwell on all six counts and the district court sentenced him to life in prison without the possibility of parole. *Caldwell I*, 803 N.W.2d at 381.

In addition to the charges brought against Caldwell, the shooter, Kirk Harrison, was also prosecuted for Cole's murder. *Id.* at 387. Kirk Harrison proceeded to a bench trial in Hennepin County District Court, where he was convicted of unintentional murder in the second degree for causing death while committing the felony of drive-by murder. *Id.* at 381. The court found that the prosecution had failed to prove that Kirk Harrison had the intent to cause the death of another, or that the LLs met the statutory definition of a gang. *Id.*

Caldwell filed a direct appeal, which was later stayed so that he could file a postconviction motion. *Id.* In Caldwell's first postconviction motion, he argued, as relevant here, that: (1) the doctrine of non-mutual collateral estoppel barred his conviction; (2) he received ineffective assistance of counsel; and (3) he was denied his Sixth Amendment right to a public trial. *Id.* at 382, 390. The postconviction court denied Caldwell's petition, which

he then appealed. *Id.* at 381. That appeal was also stayed so that Caldwell could file a second postconviction petition. *Id.*

In Caldwell's second postconviction petition, he argued that he was entitled to an evidentiary hearing on the basis of newly discovered evidence. *Id.* The postconviction court denied Caldwell's second postconviction petition, which he appealed. The Minnesota Supreme Court consolidated Caldwell's appeals and denied relief. *Id.* at 389; 391.

Subsequently, Caldwell filed a third petition for postconviction relief, alleging that three witnesses had presented false testimony in his trial. *Caldwell II*, 853 N.W.2d at 768. He requested an evidentiary hearing. *Id.* In support of his petition, Caldwell submitted a notarized affidavit from an investigator who interviewed certain witnesses, including Turnage, and obtained statements in which they recanted their trial testimony. *Id.* at 769. After the postconviction court summarily denied Caldwell's request for an evidentiary hearing, he appealed the denial of the hearing. *Id.* at 769–70. The Minnesota Supreme Court found that the postconviction court had denied the motion prematurely and remanded the matter for an evidentiary hearing. *Id.* at 778.

The postconviction court held the evidentiary hearing in June 2015. *Caldwell v. State*, 886 N.W.2d 491, 498 (Minn. 2016) ("*Caldwell III*"). Carnell Harrison recanted his trial testimony, and Brooks could not be located. *Id.* After Turnage was sworn as a witness, the court informed him of the right against self-incrimination and that the prosecution might consider perjury charges. *Id.* at 495. Turnage indicated that he understood his rights and declined the offer to talk to an attorney. *Id.* On direct examination, Turnage testified that he

had never seen Caldwell with a gun, nor had Caldwell told him that he "got down with the One-Nines." *Id.* at 495–99. He explained that his testimony was different in 2008 because he was young at the time and had felt intimidated. *Id.* at 495. On cross examination, the prosecutor referred to possible perjury charges against Turnage, as well as charges related to aiding and abetting an offender after-the-fact, and possible sentences for an aiding and abetting offense. *Id.* In light of Turnage's apparent confusion about his Fifth Amendment rights, the court recessed Turnage's testimony to allow him to seek counsel. *Id.* at 497. Thereafter, Turnage obtained counsel and the hearing resumed three months later. *Id.* At the reconvened hearing, Turnage invoked his Fifth Amendment rights and refused to answer further questions. *Id.*

The postconviction court then struck Turnage's testimony from the earlier evidentiary hearing, finding that Turnage's Fifth Amendment waiver had not been complete, knowing, and voluntary. *Id.* The postconviction court also concluded that Carnell Harrison's new testimony was not credible and even if Turnage had not testified at trial, it was unlikely that the jury would have reached a different verdict. *Id.* at 501. The postconviction court therefore denied Caldwell's third motion for postconviction relief. *Id.*

Caldwell appealed to the Minnesota Supreme Court, arguing that the postconviction court and the prosecutor had interfered with Turnage's decision to testify at the postconviction hearing, thereby violating Caldwell's Fourteenth Amendment right to due process. *Id.* In addition, he argued that the postconviction court erred by striking Turnage's testimony, and the remedy for the constitutional violation was the dismissal of the indictment. *Id.* at 498.

6

In *Caldwell III*, the Minnesota Supreme Court disagreed, finding no violation of Caldwell's constitutional rights. *Id.* at 500–03. While it acknowledged that the invocation of perjury charges can sometimes lead to the intimidation of a witness, it relied heavily on the postconviction court's first-hand observation of the tone and nature of questioning and found that the prosecution had not intimidated Turnage. *Id.* Nor did the Minnesota Supreme find any error on the part of the postconviction court in striking Turnage's earlier testimony. *Id.* Accordingly, it affirmed the postconviction court's denial of relief.

**B. Habeas Petition**

In June 2017, Caldwell filed the instant Petition in this Court pursuant to 28 U.S.C. § 2254. He identifies the following bases for his claim that he is being held in violation of U.S. law:

> **Ground One:** Ineffective Assistance of Counsel, in violation of the Sixth Amendment, based on: (1) counsel's alleged inattentiveness or indifference during jury selection; and (2) counsel's limited interaction with Caldwell prior to trial.
>
> **Ground Two:** Due process violation resulting from his conviction of committing a crime for the benefit of a gang despite insufficient evidence to satisfy all the elements of that crime. Namely, he contends that: (1) there was no evidence presented to show that he or his alleged gang existed for the purpose of engaging in illegal activity nor did any evidence show a pattern of crime committed by the alleged gang; (2) the principal in the crime for which Caldwell was charged with aiding and abetting was acquitted of committing the crime for the benefit of a gang; and (3) the amount of gang-related testimony prejudiced Caldwell's right to a fair trial.
>
> **Ground Three:** Due process violation based on Caldwell's conviction for intentional and premeditated murder despite insufficient evidence to satisfy all the elements of the crime. Specifically, he contends that the prosecution failed to present evidence of the principal's premeditation or intent and the principal

was acquitted of premeditation and intentional murder counts after a bench trial.

**Ground Four:** Due process violation based on Caldwell's conviction for aiding and abetting Kirk Harrison, the principal, for a crime for which Harrison had been acquitted after the prosecution had a full and fair opportunity to litigate the issues of Harrison's intent and premeditation.

**Ground Five**: Due process violation arising from a postconviction hearing, in which a witness who was in the process of giving testimony favorable to Petitioner, asserted his right against self-incrimination after being threatened with perjury charges and a sentence of up to "half a life sentence" for "aiding an offender, accomplice after the fact" during the prosecution's cross examination.

**Ground Six**: Denial of Sixth Amendment right to a public trial based on the exclusion of Caldwell's mother from the courtroom during trial, and later the entire floor of the courthouse in which the courtroom was located, and the locking of the courtroom doors during jury instructions.

(Pet. at 4–14.)

In the April 2018 R&R, Magistrate Judge Leung recommended the denial of Caldwell's Petition, rejecting each basis for relief.

As to Ground One, Caldwell's claim of ineffective assistance of counsel, the magistrate judge agreed with the Minnesota Supreme Court's determination that Caldwell failed to rebut the presumption that his trial counsel's voir dire performance was reasonable. (R&R at 19–20) (citing *Caldwell I*, 803 N.W.2d at 386–87).  Likewise, the magistrate judge found that the Minnesota Supreme Court was not objectively unreasonable in finding that Caldwell had failed to demonstrate prejudice resulting from trial counsel's allegedly deficient performance during voir dire.  (*Id.* at 23.)

Regarding the attorney-client relationship, Magistrate Judge Leung also agreed with the Minnesota Supreme Court that the number of attorney client consultations alone was not determinative of the adequacy of representation and that Caldwell's trial counsel had advised him competently. (R&R at 23–24) (citing *Caldwell I*, 803 N.W.2d at 387–88.) Also, even assuming that the Minnesota Supreme Court unreasonably assessed counsel's performance, the magistrate judge found that Caldwell failed to show that he was prejudiced. (*Id.* at 25–26.)

Finding that the Minnesota Supreme Court's determination of Petitioner's ineffective assistance claim was neither contrary to clearly established law nor objectively unreasonable, the magistrate judge recommended that Caldwell be denied relief on Ground One of his Petition. (*Id.* at 26.)

Regarding Grounds Two and Three, Magistrate Judge Leung first addressed the sufficiency of the gang-related evidence. He found no evidentiary deficiencies, noting the findings of the Minnesota Supreme Court concerning a number of trial witnesses who testified about the following: (1) their membership in the LL gang; (2) the LL gang hand signal; (3) the rivalry between the LLs and the One-Nines; (4) that LLs sell drugs, including crack cocaine and marijuana; and (5) that LLs engage in shoot-outs with other gangs that encroach upon their territory, including the One-Nines. (*Id.* at 29) (citing *Caldwell I*, 803 N.W.2d at 380–81). In addition, the magistrate judge noted that witness Cey Barber had testified that he was with Caldwell on the afternoon of the shooting, saw Ill Will in the group of One-Nines, heard some shots, put his head down, then heard Kirk Harrison fire

more shots.  (*Id.*)  (citing *Caldwell I*, 803 N.W.2d at 380–81.)  In light of this evidence, Magistrate Judge Leung found that the Minnesota Supreme Court had properly concluded, consistent with Minn. Stat. § 609.11, subd. 9, that there was sufficient evidence from which a jury could infer that the LLs had, as a primary activity, the commission of one or more enumerated criminal offenses, and were engaged in a pattern of criminal activity.  (*Id.* at 30–31) (citing *Caldwell I*, 803 N.W.2d at 385–86).  Finding that the Minnesota Supreme Court's determination regarding the status of LL as a gang and its gang-related activities was not unreasonable, the magistrate judge recommended the denial of relief sought in Ground Two of Caldwell's Petition. (*Id.* at 33.)

As to the sufficiency of the evidence concerning intent and premeditation, Magistrate Judge Leung focused on the sufficiency of the evidence at Caldwell's trial, not Kirk Harrison's bench trial.  (*Id.* at 33.)   The magistrate judge noted that several trial witnesses had testified about the rivalry between the LLs and One-Nines and the events that occurred on the day of the shooting, including the shooting itself.  (*Id.* at 34–35) (citing *Caldwell I*, 803 N.W.2d at 379–80).  He agreed with the reasoning of the Minnesota Supreme Court that there was sufficient evidence from which a jury could infer that Kirk Harrison had a rivalry with Ill Will, that Harrison had tried to shoot him earlier in the day, and that Harrison believed he was shooting at Ill Will when he fired into the group of people that included Cole and Ill Will.  (*Id.* at 37) (citing *Caldwell I*, 803 N.W.2d at 37.)

As further evidence of intent and premeditation to convict Caldwell of aiding and abetting first degree intentional murder, Magistrate Judge Leung noted comments made by

Caldwell and Kirk Harrison on the day of the shooting that they intended to retaliate against the One-Nines and Kirk Harrison's actions in initially attempting to shoot at the One-Nines. (*Id.*at 39–41.) After Harrison's initial efforts to shoot failed, he realized that the gun's safety was on, and then removed the safety, firing into the crowd of One-Nines six or seven times. (*Id.*) While Caldwell argues that the sole testimony concerning intent came from Turnage, Magistrate Judge Leung disagreed, noting all of this evidence. Thus, even without Turnage's testimony that Ill Will had been the target, the magistrate judge properly concluded that the Minnesota Supreme Court's finding was not unreasonable that a jury could have inferred that Harrison acted with intent to kill and that the killing was premeditated. (*Id.* at 41.) Accordingly, the magistrate judge recommended the denial of Ground Three of Caldwell's Petition. (*Id.* at 42.)

In Ground Four of Caldwell's Petition, he asserts "that his due process rights were violated when he was convicted of aiding and abetting Kirk . . . of a crime for which Kirk . . . had been acquitted after the prosecution had a full and fair opportunity to litigate the issues of [Kirk]'s intent and premeditation." (Pet. at 10–11.) Magistrate Judge Leung found that while Caldwell had presented the issue of statutory interpretation of Minn. Stat. § 609.05 to the Minnesota Supreme Court (concerning liability for the crimes of another), the issues of non-mutual collateral estoppel and fundamental fairness were ultimately not fairly presented in his consolidated appeal. (R&R at 12.) In addition, the magistrate judge found that any fundamental fairness claim was now procedurally defaulted, rather than merely unexhausted, (*id.* at 14) (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976),

and that the Petition is not a "mixed petition," containing a claim for which there is an available state court remedy. (*Id.* at 14–15.) For all of these reasons, Magistrate Leung recommended the denial of relief on Count Four. (*Id.* at 15.)

Regarding Count Five, Caldwell's due process claim concerning the testimony of postconviction witness Turnage, the magistrate judge rejected Caldwell's argument that the government had interfered with the defense witness in violation of the Sixth Amendment. (R&R at 59–60.) The magistrate judge found that the Minnesota Supreme Court's determination of no interference by the prosecutor was neither contrary to clearly established federal law nor unreasonable. (*Id.* at 62–63) (citing *Caldwell III*, 886 N.W.2d at 502). Accordingly, he recommended that Caldwell be denied relief as to this claim.

Finally, with respect to Ground Six of Caldwell's Petition, Magistrate Judge Leung found that Caldwell's right to a public trial was not denied when his mother was excluded from the courtroom and the trial judge locked the courtroom doors during jury instructions. (*Id.* at 42–52.) He noted that although the Sixth Amendment guarantees the right to a public trial in all criminal prosecutions, that right must give way in some situations to other rights or interests. (*Id.* at 49.) But most fatal to Caldwell's claim, the magistrate judge found, was that not all spectators were excluded from the courtroom. (*Id.* at 50.) Accordingly, he recommended that this claim for relief be denied.

## III. DISCUSSION

The district court reviews de novo those portions of the R & R to which a specific objection is made and "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *accord* D. Minn. L.R. 72.2(b). Here, Petitioner objects to all of the magistrate judge's findings, reasserting the arguments that he presented to Magistrate Judge Leung.

### A. Procedural Bar for Claim Concerning Acquittal of Principal

As noted, the magistrate judge recommended the denial, on procedural grounds, of Caldwell's due process claim that a defendant who has been charged as an accomplice cannot be convicted of a crime when the principal has been acquitted of the same crime. (R&R at 12–15.) In his Objections, Caldwell argues that simply characterizing an issue as one involving due process is sufficient to give state courts the opportunity to decide the federal constitutional issue. (Objs. at 11.)

"28 U.S.C. § 2254 requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citing *Picard v. Connor*, 404 U.S. 270 (1971)). Thus, a habeas petitioner must have "fairly presented" the "substance" of his federal habeas corpus claim to the state courts, prior to seeking habeas relief. *Id.*

As the magistrate judge observed, in *Caldwell I*, the Minnesota Supreme Court addressed the question of whether a defendant charged as an accomplice can be convicted of a crime for which the principal has been acquitted. (*Id.* at 10.) Having reviewed the appellate record, Magistrate Judge Leung noted that the argument was two-pronged, with the first prong grounded in statutory interpretation of Minn. Stat. § 609.05, and the second based on

*Standefer v. United States*, 447 U.S. 10 (1980), and the doctrine of non-mutual collateral estoppel. (R&R at 10–11) (citing Resp't's App. at 75, 76–80 [Doc. No. 12]).

Because Caldwell's counsel clarified at oral argument before the Minnesota Supreme Court that his argument was limited to the interpretation of Minn. Stat. § 609.05, subd. 4, the Minnesota Supreme Court confined its analysis in *Caldwell I* to that issue. 803 N.W.2d at 382 n.3. While Caldwell now acknowledges that counsel may have waived the non-mutual estoppel argument before the state court, he asserts that nothing indicates the waiver of a fundamental fairness argument present in the instant claim. (R&R at 13) (citing Pet'r's Resp. at 23–24 [Doc. No. 15]). Alternatively, he asks this Court to deem any unexhausted claims deleted from this Petition, so as to permit the consideration of all of his exhausted claims, or that he be granted leave to amend his Petition in order to proceed with his exhausted claims. (*Id.*) (citing Pet'r's Resp. at 24.)

The Court agrees with Magistrate Judge Leung that the issue of fundamental fairness was "part and parcel" of the issue of non-mutual collateral estoppel, and not a separate federal claim. (*Id.*) As the magistrate judge observed, in order to "fairly present" a constitutional claim, a petitioner must refer to a "specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." (*Id.*) (citing *Nash*, 807 F.3d 892, 898 (8th Cir. 2015)). But because Caldwell's counsel waived the issue of non-mutual collateral estoppel, the fundamental fairness claim was not fairly presented to the Minnesota Supreme Court. Accordingly, the

Minnesota Supreme Court lacked a fair opportunity to apply the law to the facts relevant to this constitutional claim.

As noted in the R&R, a claim is unexhausted if state law allows the petitioner to raise the claim by any available state court procedure. *See* 28 U.S.C. § 2254(c). However, where a claim has not been fairly presented and a state procedural rule precludes further litigation of the claim, the claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Minnesota, the state procedural rule enunciated in *Knaffla*, 243 N.W.2d at 741, holds that "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." This procedural rule therefore denies further litigation of claims that could have been raised on direct appeal, *Murphy v. King*, 652 F.3d 845, 849–50 (8th Cir. 2011), barring not only claims that were known at the time of direct appeal, but also claims that should have been known. *Sontoya v. State*, 829 N.W.2d 602, 604 (Minn. 2013). The Court agrees with Magistrate Judge Leung that because Caldwell raised a fundamental fairness argument as part of his consolidated direct appeal, but subsequently waived it at oral argument, *Knaffla* bars him for pursuing this argument in a subsequent petition for postconviction relief. The claim is therefore procedurally defaulted.

As the magistrate judge observed, while procedurally defaulted claims are generally barred from federal habeas review, *Coleman*, 501 U.S. at 750, they may be considered on the merits only when one of two exceptions applies: (1) the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; and (2)

15

where the petitioner can demonstrate that the failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* If neither exception applies, the federal court will not entertain the merits of the otherwise procedurally defaulted claim. These exceptions do not apply here, and, as Magistrate Judge Leung notes, Caldwell proposes dropping this claim entirely so that the other claims in his Petition may be considered. Because the magistrate judge considered the merits of Caldwell's other claims, he appears to have granted this alternative request to examine Caldwell's exhausted, non-defaulted claims. This Court agrees with that approach and proceeds to analyze Caldwell's other grounds for relief.[3]

## B. Right to Present a Complete Defense

Caldwell first objects to the magistrate judge's analysis and recommendation as to his due process claim arising from the government's questioning of Turnage at the postconviction evidentiary hearing. (Objs. at 1–6.) Caldwell contends that Turner's invocation of the Fifth Amendment and subsequent refusal to testify resulted from the prosecution's threats and intimidation. (Pet. at 12.) In his Objections, Caldwell asserts that the magistrate judge drew artificial distinctions between the facts here and those present in *Webb v. Texas*, 409 U.S. 95, 97–98 (1972), a case in which the comments made by the prosecution to a witness were found to be violative of due process. He also argues that the Minnesota Supreme Court and Magistrate Judge Leung erred by presuming that "there was some legitimate reason for

---

[3] The Court also agrees with the magistrate judge that Caldwell's Petition is not a mixed petition, containing both exhausted and unexhausted claims, and which would require dismissal without prejudice. (R&R at 15.) "The presence of a procedurally defaulted claim . . . does not create a mixed petition." *Maxwell v. Gau*, No. 12-cv-1770 (ADM/TNL), 2014 WL 1371912, at *9 n.3 (D. Minn. Apr. 8, 2014).

Turnage to be threatened the way he was." (Objs. at 5.) He asserts that, as a practical matter, Turnage could not have been prosecuted for perjury due to the applicable statute of limitations. (*Id.*)

The Court disagrees with Caldwell's arguments. As the magistrate judge observed, "[i]t is not improper per se for a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Risken*, 788 F.2d 1361, 1370 (8th Cir. 1986) (quotation omitted).

In *Caldwell III*, the Minnesota Supreme Court considered whether the prosecution had interfered with Caldwell's right to present a complete defense under the Fourteenth Amendment, assuming without deciding that the right also applied to postconviction proceedings. 886 N.W.2d at 500–01. Here, the magistrate judge noted that in *Webb*, 409 U.S. at 98, the trial judge had made threatening remarks to a single witness for the defense in the context of trial. (R&R at 60.) He noted a lack of Supreme Court precedent addressing a due process claim based on government interference with a defense witness in the context of a postconviction proceeding. (*Id.*) Magistrate Judge Leung also cited authority for the proposition that the "right to due process [in postconviction context] is not parallel to a trial right, but rather must be analyzed in light of the fact that [the individual] has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." (*Id.* at 61) (quoting *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009)). The Court agrees that because there is no U.S. Supreme Court authority confronting the

specific question, the state court's decision cannot be considered contrary to any decisions of the U.S. Supreme Court. *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015).

This Court also agrees with the magistrate judge's substantive finding that the Minnesota Supreme Court's ruling on this claim was not unreasonable. (R&R at 61–62.) As Magistrate Judge Leung noted, the state court's factual determinations are presumed correct, unless clear and convincing evidence shows that the findings lack support in the record. (*Id.* at 61) (citing *Whitehead v. Dormire*, 340 F.3d 532, 536 (8th Cir. 2003)). Indeed, the Minnesota Supreme Court found the questions that the prosecutor posed to Turnage at the postconviction hearing were "inartful." *Caldwell III*, 886 N.W.2d at 502. However, the court relied on the postconviction court's first-hand observation of the exchange, finding that the postconviction court was in the best position to evaluate whether Turnage was in fact intimidated, "having heard the tone of the questioning." *Id.* The postconviction court found that the prosecutor had not attempted to intimidate Turnage, but instead had simply vigorously cross-examined him. *Id.* This conclusion finds support in the record. This Court thus agrees with the magistrate judge that Caldwell has not shown by clear and convincing evidence that the Minnesota Supreme Court's determination lacked support in the record, rendering it unreasonable. Accordingly, Caldwell is not entitled to habeas relief on this basis.

## C. Sufficiency of the Evidence

Caldwell also objects to the magistrate judge's findings and recommendations with respect to his due process claims concerning the sufficiency of the evidence, asserted in Grounds Two and Three of his Petition. (Objs. at 6–7.)

The magistrate judge applied the proper standard of review to these claims. (R&R at 27.) As he noted, the Constitution requires proof beyond a reasonable doubt in order to convict a person of a crime. *Jackson v. Virginia*, 443 U.S. 307, 309 (1979). A habeas petitioner is entitled to relief if, upon a review of the record evidence at trial, no rational trier of fact would have found proof of guilt beyond a reasonable doubt. *Nash*, 807 F.3d at 897. "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)).

### 1. Crime Committed for the Benefit of a Gang

As to the evidence regarding whether Cole's killing was committed for the benefit of a gang, Caldwell acknowledges that some witnesses testified that the LLs sold drugs and that the LLs and One-Nines were known enemies. (Objs. at 7.) However, he asserts that "[t]here was nothing to give any indication from that testimony that these things were one of the primary activities of the gang." (*Id.*)

The Court agrees with the magistrate judge's analysis of the law and the facts. (R&R at 27–33.) As noted, in *Caldwell I*, 803 N.W.2d at 385, the Minnesota Supreme Court found that the evidence at Caldwell's trial established that the LLs met the statutory definition of a gang in Minn. Stat. § 609.229, subd. 1. Namely, the court found that: (1) Caldwell did not dispute that the LL gang is a group of three or more people, with a common identifying sign or symbol, which was supported by the testimony of several witnesses; (2) that witness testimony was sufficient for the jury to find that the LL gang had, as one of its primary

19

activities, the commission, or attempted commission, of one or more enumerated offenses in Minn. Stat. § 609.11, subd. 9, including drive-by shooting and certain drug offenses; and (3) witness testimony concerning drug sales and a pattern of shooting rival gangs was sufficient for the jury to infer that LL gang members had engaged in a pattern of criminal activity. *Id.* at 386. Thus, the Minnesota Supreme Court found that there was sufficient evidence to support Caldwell's conviction for aiding and abetting first-degree murder for the benefit of a gang. *Id.*

The Minnesota Supreme Court's determination was not unreasonable, as the magistrate judge properly found. Again, several witnesses testified that the LLs sold drugs and shot at rival gang members. Juries have broad discretion in drawing inferences from the evidence presented at trial, as long as they "draw reasonable inferences from basic facts to ultimate facts." *Coleman*, 566 U.S. at 655 (citation omitted). It was certainly not unreasonable for the Minnesota Supreme Court to find that a jury could infer from the evidence presented at trial that the LLS had, as a primary activity, the commission of one or more of the offenses listed in Minn. Stat. § 609.11, subd. 9, and that they engaged in a pattern of criminal activity. *See Cavazos*, 565 U.S. at 7 ("[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'") (quoting *Jackson*, 443 U.S. at 319). In sum, the Court finds that it was not unreasonable for the Minnesota Supreme Court to find that the evidence was

constitutionally sufficient to support Caldwell's conviction for aiding and abetting a crime for the benefit of a gang. Accordingly, Caldwell is not entitled to relief on this basis.

## 2. Premeditation and Intent

With respect to the sufficiency of the evidence concerning premeditation and intent, Caldwell asserts that only one witness, Turnage, testified that Caldwell had bragged about the crime after the fact, and stated that Ill Will was the intended target. (Objs. at 8.) But he asserts that Turnage later recanted that testimony, only to be "threatened into silence" by the prosecution. (*Id.*) He also argues that Cey Barber testified to initially hearing a first shot from elsewhere, before Kirk Harrison started shooting. (*Id.*) Thus, Caldwell contends, there was not sufficient evidence from which a reasonable jury could have found the elements of premeditation and intent. (*Id.*)

The Court disagrees. As noted in *Caldwell I*, "[i]ntent means that the defendant 'either has the purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result,'" 803 N.W.2d at 384 (quoting Minn. Stat. § 609.02, subd. 9(4)), and "[p]remeditation means 'to consider, plan or prepare for, or determine to commit the act referred to prior to its commission.'" *Id.* (quoting Minn. Stat. § 609.18). The Minnesota Supreme Court found that there was sufficient evidence at trial from which the jury could infer that Kirk Harrison acted with intent to kill and that the killing was premeditated. *Id.*

Caldwell argues that the only testimony related to intent to cause the death of a specific person, Ill Will, came from Turnage, who later attempted to recant his testimony. (Objs. at

8.)  But Turnage did not provide the only testimony establishing intent.  As the magistrate judge noted, there was evidence of the gang rivalry between the LLs and One-Nines, including a previous incident in which the One-Nines had shot at Caldwell and Kirk.  (R&R at 40) (citing *Caldwell I*, 803 N.W.2d at 379–81).  Moreover, there was testimony regarding the particular rivalry between Kirk Harrison and Ill Will.  (*Id.* at 41.)  Carnell Harrison and Brooks testified regarding several comments made by Caldwell and Kirk Harrison on the day of the shooting that they intended to retaliate against the One-Nines, including a comment made by Kirk Harrison to Caldwell shortly before the shooting that Caldwell should have taken a shot at the One-Nines earlier.  (*Id.* at 40)  There was evidence that Kirk believed he was shooting at Ill Will when he fired into the group of One-Nines.  (*Id*. at 41.)  Furthermore, Harrison took the time to remove the gun's safety after he initially failed to shoot at the One-Nines, and proceeded to fire the gun at the group multiple times.  (*Id.*)  The Court therefore agrees with the magistrate judge that even without Turnage's testimony that Ill Will had been the intended target, the Minnesota Supreme Court's finding was not unreasonable that sufficient evidence supported the jury's inference that Kirk Harrison acted with intent to kill and the killing was premeditated.  In fact, the court's reasoning in *Caldwell I* was thorough and well supported by the evidence.  Accordingly, this basis of relief fails.

### D.  Right to Public Trial

As to Caldwell's Sixth Amendment claim concerning the closure of the courtroom during his trial, he takes issue with the magistrate judge's analysis that because the courtroom was only partially closed, there was no violation.  (Objs. at 8.)  Caldwell contends that neither

*Waller v. Georgia*, 467 U.S. 39 (1984), nor *Presley v. Georgia*, 558 U.S. 209 (2010), contain language limiting the applicability of a defendant's right to a public trial based on whether the courtroom is partially closed. (Objs. at 9 ) He also contests the determination of the Minnesota Supreme Court in *Caldwell I*, in which it concluded that there was no closure. (*Id.*)

While the Sixth Amendment provides that the accused shall have a public trial in all criminal prosecutions, the Supreme Court has held that this right must give way in certain instances to other rights, including the defendant's right to a fair trial. *Waller*, 467 U.S. at 45; *accord Presley*, 558 U.S. at 213. The R&R fully recounts the pattern of Caldwell's mother's outbursts during trial, which ultimately prompted the court to exclude her from the courtroom and to lock the courtroom door during jury instructions. (R&R at 42–48.) The trial court judge expressed his concerns regarding the effect of Caldwell's mother's visible and audible reactions to court proceedings on her son's right to a fair trial. (*Id.* at 43–44) (quoting portion of trial transcript in which court admonished Caldwell's mother and warned her that her conduct could hurt her son's case).

Caldwell argues that neither *Waller* nor *Presley* address Sixth Amendment rights in the context of a partially closed courtroom. (Objs. at 9.) Certainly, the magistrate judge acknowledged that those cases involved complete closures of the courtroom to all spectators, (R&R at 50) (citing *Waller*, 467 U.S. at 42; *Presley*, 558 U.S. at 210), but he also observed that several circuit courts of appeal have rejected habeas claims based on partial closures, distinguishing them from *Waller*. (*Id.* at 51) (citing *Enriquez v. Sec'y*, 662 F. App'x 650, 654–56 (11th Cir. 2016) (per curiam); *Drummond v. Houk*, 797 F.3d 400, 402–04 (6th Cir.

2015); *Angiano v. Scribner*, 366 F. App'x 726, 727 (9th Cir. 2010); *Garcia v. Bertsch*, 470 F.3d 748, 754 (8th Cir. 2006)). Magistrate Judge Leung further noted that absent Supreme Court authority that confronts the specific issue in question, the state court's decision cannot be considered "contrary to" Supreme Court authority. (*Id.*) (citing *Woods*, 135 S. Ct. at 1377). Accordingly, because the Minnesota Supreme Court did not reach a conclusion contrary to the U.S. Supreme Court, nor decide Caldwell's case differently than the Supreme Court on a set of materially indistinguishable facts, the magistrate judge properly found no violation of Caldwell's right to a public trial. (*Id.* at 52.)

This Court therefore finds no Sixth Amendment violation based on the exclusion of Caldwell's mother from the courtroom after she repeatedly disrupted the proceedings. At no point during Caldwell's trial were all spectators excluded, even when the courtroom doors were locked. Caldwell is not entitled to habeas relief on this basis.

### E. Ineffective Assistance of Counsel

With respect to Caldwell's claim of ineffective assistance of counsel in Ground One of his Petition, he objects to the magistrate judge's conclusions, which, in turn, relied upon the conclusions of the Minnesota Supreme Court. (Objs. at 10.)

In order to obtain relief for ineffective assistance of counsel, Petitioner must establish both that his counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 688 (1984). Caldwell bears the burden of establishing to a reasonable probability that, but for his counsel's alleged errors, the result of the proceeding would have been

24

different. *Id.* This is a "heavy burden," *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996), requiring a showing that the deficiency in counsel's performance was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. A defendant must show that counsel's errors were not the result of "reasonable professional judgment." *Id.* at 690. Moreover, a court's review of counsel's performance is highly deferential, and there is a strong presumption of adequate assistance. *Id.* A defendant must then show that the deficient performance actually prejudiced the outcome of the proceedings. *Id.* at 687.

### 1. Voir Dire Performance

Caldwell argues that his trial counsel perfunctorily "passed six jurors for cause" and used peremptory strikes on eight jurors without asking a single question of any of these jurors. (Objs. at 10.) He contends that this "effectively defeated the main purposes of jury selection," which he identifies as "(1) establish[ing] rapport with the jury; (2) learn[ing] about jurors' beliefs and attitudes to make intelligent use of challenges; and (3) familiariz[ing] the jury with applicable legal and factual concepts." (*Id.*) (citing Thomas Mauet, Trial Techniques 42 (Aspen 2007)).

The magistrate judge found that Caldwell failed to meet the performance and prejudice prongs necessary to establish a claim of ineffective assistance. (R&R at 19.) As Magistrate Judge Leung noted, Caldwell presented arguments that asked this Court to conduct a de novo review of trial counsel's performance, which is improper in the habeas context. (*Id.* at 20) (citing *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012)). Rather, the proper question is

whether the Minnesota Supreme Court's decision on this issue in *Caldwell I* was "contrary to, or an unreasonable application of, clearly established federal law." *Williams*, 695 F.3d at 831.

This Court agrees with the magistrate judge's analysis that Caldwell has not argued, much less shown, that the Minnesota Supreme Court's conclusion met the standard necessary for relief. As the court found in *Caldwell I*, his trial counsel appears to have been well prepared during voir dire, as his questions demonstrated his familiarity with the answers on the jurors' questionnaires and he asserted his right to strike jurors for cause on several occasions. 803 N.W.2d at 386–87. Likewise, the magistrate judge properly found that even if the Minnesota Supreme Court had unreasonably applied the performance prong of the *Strickland* analysis, Caldwell failed to demonstrate that its application of the prejudice prong was unreasonable. (R&R at 21.) As the Minnesota Supreme Court noted, Caldwell failed to assert or demonstrate that any particular juror should have been stricken. *Caldwell I*, 803 N.W.2d at 387. Thus, this Court also agrees with the magistrate judge that it was not objectively unreasonable for the Minnesota Supreme Court to find that Caldwell had failed to show prejudice resulting from trial counsel's performance during voir dire. *Strickland,* 466 U.S. at 687. Accordingly, because Caldwell has not met the heavy burden of demonstrating deficient performance and resulting prejudice, this basis for relief fails.

## 2. Attorney-Client Relationship

As to the portion of Caldwell's ineffective assistance claim based on the attorney-client relationship, he argues that he was denied effective assistance because trial counsel met

with him only three times before trial. (R&R at 23.) Caldwell distinguishes the facts of his case from *Morris v. Slappy*, 461 U.S. 1, 6 (1983), which Magistrate Judge Leung cited in the R&R. (Objs. at 10.) He asserts that trial counsel in *Slappy* had the benefit of investigative work done by prior defense counsel, which was not the case here. (*Id.*) Caldwell also argues that he "was only allowed to see the evidence against him when in the presence of his attorney, meaning that except for the very rare instances he met with counsel, he was not able to view the evidence against him before trial." (*Id.*) He contends that the magistrate judge's recommendation to deny relief on this basis constitutes an improper application of clearly established federal law. (*Id.* at 11.)

The Court disagrees. In *Slappy*, the U.S. Supreme Court held that the Sixth Amendment does not guarantee a "meaningful relationship" between a defendant and his counsel. 461 U.S. at 15. Nor does "every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violate[ ] a defendant's Sixth Amendment right to counsel." *Id.* In *Slappy*, the Supreme Court found no constitutional violation and concluded that substitute counsel, who undertook representation only six days before trial, was well-prepared. *Id.* at 12–13. In particular, the court noted counsel's prompt review of the investigation, his review of materials prepared for trial by prior defense counsel, his conferences with the defendant, and his statements to the court that he was ready for trial. *Id.*

Here, the Minnesota Supreme Court properly examined counsel's performance and found that counsel had advised Caldwell competently, having reviewed with him the

witnesses who were to testify for the defense and Caldwell's desire to reject a plea offer, to have a speedy trial, and to testify on his own behalf. *Caldwell I*, 803 N.W.2d at 387. Having reviewed the full trial record, the court concluded that trial counsel was well prepared and conducted a competent defense, including the cross examination of witnesses who presented an alternative theory of the case. *Id.* Furthermore, defense counsel had also hired an investigator who met with Caldwell a few times prior to trial, and Caldwell himself informed the district court that he did not wish to retain new counsel. *Id.* In sum, the facts here fully support the findings of the magistrate judge and the Minnesota Supreme Court that there was no Sixth Amendment violation based on any deficiencies in the attorney-client relationship.

But even if the facts demonstrated otherwise, the Court agrees with the magistrate judge that Caldwell has not demonstrated that his counsel's performance actually prejudiced his case. *Strickland,* 466 U.S. at 687. Accordingly, this ground of relief fails.

### F.  Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A Certificate of Appealability cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Such a "showing" requires that he demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, Caldwell has not made such a showing, and thus is not entitled to a Certificate of Appealability.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1.    Caldwell's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 [Doc. No. 1] is **DENIED**;

2.    The Court **ADOPTS** the Magistrate Judge's Report and Recommendation [Doc. No. 16] in its entirety;

3.    Caldwell's Objections [Doc. No. 17] to the Report and Recommendation are **OVERRULED**;

4.    A Certificate of Appealability is **NOT GRANTED**; and

5.    This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 5, 2019                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge